Filed 8/8/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CLAREMONT MCKENNA COLLEGE,<br><br>    Defendant and Respondent. | B281722<br><br>(Los Angeles County<br>Super. Ct. No. BS158692) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Reversed and remanded with directions.

    Scheper Kim & Harris, Marc S. Harris and Alexander H. Cote for Plaintiff and Appellant.

    O'Melveny & Myers, Apalla U. Chopra, Jason A. Orr, and Daniel J. Tully for Defendant and Respondent.

———————————

John Doe appeals from the trial court's denial of his petition for a writ of administrative mandate. John sought to set aside his one-year suspension and other discipline imposed by respondent Claremont McKenna College (CMC) after a CMC review committee (the Committee) found that John had nonconsensual sex with Jane Roe, a student at a neighboring college.[1] John argues that he was deprived of a fair hearing because Jane did not appear, thus denying John and the Committee an opportunity to question her and assess her credibility. John further claims that CMC did not provide adequate notice, CMC's investigator failed to interview a witness identified by John, and the Committee's decision was not supported by substantial evidence.

We hold that where, as here, John was facing potentially severe consequences and the Committee's decision against him turned on believing Jane, the Committee's procedures should have included an opportunity for the Committee to assess Jane's credibility by her appearing at the hearing in person or by videoconference or similar technology, and by the Committee's asking her appropriate questions proposed by John or the Committee itself. That opportunity did not exist here. Accordingly, we reverse the judgment. We do not reach John's other challenges to the fairness of the hearing or the judgment.

---

[1] The parties refer to the individuals involved by the pseudonyms "John Doe" and "Jane Roe," and we shall do the same. For clarity, we use "John" and "Jane" throughout the remainder of the opinion.

# FACTUAL BACKGROUND

### 1.    CMC's sexual misconduct policy

CMC's "Discrimination, Harassment, Sexual Harassment, and Sexual Misconduct Policy" prohibits "sexual assault," which is defined as "any sexual intercourse, however slight, . . . that is without consent or by force."  Under this policy, "[e]ffective consent consists of an affirmative, conscious decision by each participant to engage in mutually agreed-upon (and the conditions of ) sexual activity."  Consent requires the parties to "demonstrate a clear and mutual understanding of the nature and scope of the act to which they are consenting and a willingness to do the same thing, at the same time, in the same way."  Consent is invalid "[i]n the absence of clear communication or outward demonstration, . . . . Consent may not be inferred from silence, passivity, lack of resistance, or lack of active response."  Also, "[c]onsent may be withdrawn by any party at any time," and therefore "individuals choosing to engage in sexual activity must evaluate [c]onsent in an ongoing manner and communicate clearly throughout all stages of sexual activity. Withdrawal of [c]onsent can be an expressed 'no' or can be based on an outward demonstration that conveys that an individual is hesitant, confused, uncertain, or is no longer a mutual participant."

### 2.    The incident

The following information is derived from the investigator's final report, the summaries of her interviews with John, Jane, and various witnesses, and documentary evidence collected by the investigator.

In the fall of 2014, John was a freshman at CMC and Jane was a freshman at neighboring Scripps College. They had met through a mutual friend and were casual acquaintances. During a party at CMC on October 4, 2014, Jane called John and asked him to meet her by a fountain, which he did. Both John and Jane were drunk; according to Jane, John had encouraged her to drink shots of vodka earlier in the evening, but John denied seeing Jane that day before meeting her at the fountain. After talking for a few minutes by the fountain, John and Jane began kissing, and John invited Jane back to his dorm room.

Once there, John and Jane kissed and undressed each other. At some point John left the room to get condoms from outside the resident advisor's room. John and Jane attempted sexual intercourse using a condom, but John could not maintain an erection and the condom slipped off. Jane performed oral sex to restore John's erection. He put on another condom and they tried again. They repeated this cycle several times, with John losing his erection, the condom falling off, and Jane performing oral sex to restore the erection. According to John, this continued for about an hour; Jane estimated two hours.[2]

The parties dispute what happened next. According to Jane, John started getting rough and slamming his groin into hers. She asked him to stop because it was painful. John removed the condom and continued to penetrate her. Jane

---

[2] There is conflicting evidence as to how many times John and Jane attempted sex. John told the investigator they had used 10 condoms, and Jane texted John the day after the incident stating that they had attempted intercourse more than 10 times. But Jane later told the investigator they had only tried three times, at which point they ran out of condoms.

struggled to get out from under him but could not. She begged him to stop, but John pinned her down and continued to have sex. Finally he passed out on top of her, at which point she got out from under him and left the room.

According to John, he and Jane mutually agreed to proceed without a condom because of the difficulty he was having maintaining an erection. John asked Jane if she wanted to try having sex without a condom and she said, " 'yes, we might as well, just don't come inside me,' " although John told the investigator he could not recall the specific words. They tried numerous sexual positions without the condom. Jane never objected, although John thought she seemed tired and not "super into it" because she had been making most of the effort to maintain his erection. When they finished, Jane performed oral sex again; John stopped her because he could not get an erection. Jane asked John if they were going to be " 'friends with benefits' " and he said yes. She got dressed and left.

### 3.     Jane's and John's post-incident conduct

Immediately after leaving John's room, Jane contacted several schoolmates to go with her to purchase a Plan B contraceptive. The investigator interviewed several of those schoolmates, who reported that Jane was "distraught," "freaking out," "panicked," "distressed," and "worried." Jane told them she had made a mistake by having unprotected sex. Jane did not tell them that she had been sexually assaulted.

The next day, October 5, 2014, John and Jane exchanged text messages. John claimed not to remember what had happened the night before, asking if Jane had come back to his room with him. Jane said yes, and "we should probably talk about that at some point today." John asked, "Did I assault you?"

5

Jane said "No haha you did not" but said they had not used a condom. John offered to buy her a pregnancy test. John told the investigator he did in fact remember the previous night, but pretended not to in order to "distance himself from having sex with" Jane so as to avoid forming a bond with her.

John and Jane met later that day. John gave Jane pregnancy tests and she gave him a comic book as a gift. Later on they exchanged further texts; they discussed comic books, and Jane said they had had sex more than 10 times the night before and she was bruised and sore. At 1:30 the next morning, Jane texted John again saying she could not walk and needed to go to the campus medical center. John asked if he had hit her, and she replied he was "a bit rough." When the investigator later asked John about Jane's injuries, he admitted that she was hurt but did not know for certain how it had happened. He "d[id] not think he was aggressive," but thought perhaps he had gotten too rough when performing oral sex or "fingering her."

On October 6, 2014, Jane went to the campus medical center. Jane submitted a form stating that the cause of her injury was "excessive sex over prolonged period of [time] in a dorm room at CMC." According to Jane, the doctors asked her if she had been sexually assaulted but she denied it. The medical center referred her to urgent care. Jane said the doctor at urgent care told her she had vaginal bleeding due to friction and it appeared the sex had been rough. Jane did not tell the doctor she had been assaulted. The doctor told her to stay in bed. Jane's written "Patient Plan" from this visit assessed her with a

"Menstrual disorder NEC (626.8)."[3]  The document stated, "Exam is unremarkable.  [¶]  Recommend pelvic rest until symptoms resolve."

Jane later texted a friend that "[T]his is gonna ma[k]e a [g]ood story one da[y]."  She then texted, "[I] just want John."  Then, "Haha but I really don't know if that's gonna happen.  I can hope but I don't want to get my hopes up.  Hope for the best but expect the worst."

After returning from urgent care, Jane texted John and asked him to come over so she could "explain everything."  Jane did not tell John at that meeting that he assaulted her.  On October 7, they exchanged more texts discussing superhero movies and television programs.  Also that day, Jane exchanged texts with a schoolmate who commented that John was cute, to which Jane responded "[H]e's so HOT."  Jane told the investigator she was pretending to be romantically interested in John so her friends would not think she had been promiscuous for "hook[ing] up without emotions."

On October 9, 2014, Jane tried to meet up with John at a party but he left and did not return.  She texted him about meeting the next day but he asked for a rain check.  Jane told the investigator this upset her.

Later that month, John told a group of friends about Jane seeking medical treatment after they had had sex, and jokingly

---

[3]  This appears to be a reference to the International Classification of Diseases, Ninth Revision, Clinical Modification, 6th Edition (ICD-9-CM).  Section 626 covers "Disorders of menstruation and other abnormal bleeding from female genital tract."  (1 ICD-9-CM Table of Diseases and Injuries, § 626.)  626.8 is the diagnosis code for "Other."  (*Ibid.*)

referred to himself as "bone hammer." At some point he told friends that he " 'literally fucked [Jane] so hard that he put her in the hospital.' " Jane heard about the "bone hammer" nickname sometime in late October, including from John himself. Mutual friends continued to use the nickname around her.

In January 2015, John texted Jane and asked if she could send him the form she had filled out at the medical center indicating that she had been injured from excessive sex. John said his friends had not believed him when he told them. Jane sent an image of the form to him. John and Jane both commented to each other that it was "hilarious."

Jane told the investigator she did not want to return to school after winter break, and stayed in bed for weeks after arriving.

Around Valentine's Day 2015, two of John's schoolmates sent him a fake Valentine's gram purportedly signed with Jane's name. The poem on the card read "Roses are red, Violets are blue, You broke my vagina, so FUCK YOU." John forwarded the gram to Jane, thinking she had sent it. Jane was very upset, and told two of her friends what had happened with John on October 4, including that John had continued to have sex with her after she had told him to stop. One of the friends encouraged Jane to report the incident, but she did not at that time. Instead, Jane wanted to talk to John and his schoolmates who sent the Valentine's gram.

On March 4, 2015, Jane texted John and asked to meet with him the next day at 6:30 p.m. John asked if they could meet in the morning instead because he was busy later and would "rather talk when I'm fresh." This further upset Jane. On

8

March 5, 2015, she reported John to the Scripps College Deputy Title IX Coordinator.

## PROCEDURAL BACKGROUND

### 1. The investigation

On March 10, 2015, CMC in conjunction with Scripps initiated an investigation pursuant to CMC's "Civil Rights Grievance Procedures." CMC and Scripps retained a third-party investigator, Katherine J. Edwards. CMC notified John in a letter that Jane had alleged that he had committed sexual assault. The letter included links to CMC's "Discrimination, Harassment, Sexual Harassment, and Sexual Misconduct Policy" and its grievance procedures.

The investigator interviewed Jane on March 18, 2015, for two hours and 40 minutes, and John on March 23 for approximately two hours. John was accompanied by his attorney. The investigator conducted multiple follow-up interviews of John and Jane. The investigator also interviewed 13 other witnesses, all schoolmates of John or Jane. Each witness reviewed the investigator's written summary of his or her interview and was permitted to make corrections; those corrections were noted in the original summary so a reader could see what had been changed. In addition to the interviews, the investigator gathered approximately 85 pages of documents, including copies of text messages, from John, Jane, and other witnesses. John also provided a four-page timeline of his interactions with Jane.

On May 2, 2015, the investigator provided the parties with a preliminary investigative report (PIR) along with the interview summaries and documentary evidence. Pursuant to CMC's

grievance procedures, on May 8, John submitted a "Written Request for Additional Investigation Steps." (Boldface and some capitalization omitted.) In the request he listed additional questions for witnesses already interviewed, including Jane, and asked that several new witnesses be interviewed, explaining the relevance of each. John also asked that the investigator interview him again on several topics, and requested additional documentary evidence including Jane's medical reports. Jane submitted a response to the PIR correcting and clarifying certain points but not requesting further investigative steps.

In response to John's requests, the investigator interviewed one new witness and clarified a point raised by one of the 13 original witnesses, but did not grant any of the other requests. The investigator did not ask Jane any of John's questions. John was granted an extension of time to submit additional evidence, which he provided. CMC's Chief Civil Rights Officer and Title IX Coordinator then concluded that the investigation was complete, and the investigator provided the parties with a final investigative report (FIR) dated May 19, 2015. Apart from describing the procedural steps that took place after the PIR was issued, adding a slightly expanded summary of the parties' claims, and attaching the new or updated interview summaries resulting from John's request for additional investigation, the FIR was largely identical to the PIR.

### 2. CMC's decision

An "Investigation Findings and Review" meeting was scheduled for May 22, 2015. Per CMC's grievance procedures, at this meeting a committee consisting of the investigator and two "Community Representatives" selected from CMC's faculty and staff would evaluate the evidence and decide by majority vote

whether John had violated CMC's sexual misconduct policy, applying a preponderance-of-evidence standard. The procedures allowed but did not require the parties to appear at the meeting and make an oral statement to the Committee. The procedures did not provide for any questioning by the Committee or the parties.

John and Jane both submitted written statements in advance of the meeting. John also appeared before the Committee at the meeting and gave an oral statement. Jane did not appear at the meeting.

Following the meeting, the Committee issued a written decision finding that John had violated CMC's sexual misconduct policy by "engaging in non-consensual intercourse." The Committee found that John and Jane initially had engaged in consensual sex using a condom,[4] that Jane's "words and actions" indicated she did not wish to have sex without a condom, and John "continued to penetrate [Jane] without protection in spite of her objection."

The Committee stated that it "saw inconsistencies in the words and actions of both parties," and that "both parties engaged in conduct that did not support their respective positions." The Committee therefore "gave more focus and credence to the information that was consistent between both parties and the information that directly related to what transpired between the two parties during their sexual encounter." Ultimately, the Committee found "that the evidence

---

[4] The Committee concluded that John had not provided Jane with alcohol "in order to facilitate a forced sexual encounter" or that Jane was so intoxicated as to lack capacity to consent.

11

presented corroborated [Jane's] allegations more than [John's]," and identified "several statements" made by John that the Committee concluded "corroborated" Jane's account. The Committee found that John's statement that he left the room to obtain condoms from the resident advisor's room "support[ed] the assertion of a mutual agreement to engage in protected sex." The Committee noted that both parties stated that Jane had performed oral sex to maintain John's erection so they could continue to engage in protected sex. The Committee found it significant that John "could not clearly recall the words that demonstrated the 'mutual decision' [to proceed without a condom] nor could he describe [Jane's] physical actions that supported continuous consent." The Committee also noted that John had said he did not think Jane was " 'super into it' " which, the Committee concluded, did not support John's claim that Jane was "actively engaged in the sexual activity." Finally, the Committee found that John's later statement to friends that " 'he literally fucked [Jane] so hard that he put her in the hospital' " supported Jane's allegation "that [John's] conduct was rough."

The Committee addressed some further points in response to John's written statement. The Committee acknowledged that "the medical reports do not fully corroborate [Jane's] allegations as to aspects of her injuries," but found that her "attempt to seek medical treatment" combined with John's statement about putting her into the hospital sufficiently "corroborated" her account. As to Jane's post-incident interactions with John, which John argued were inconsistent with someone who had been assaulted, the Committee did not feel these interactions "were of such significance" to "negate[ ]" her claim that she withdrew consent. The Committee acknowledged that the Valentine's Day

12

prank "may have been an impetus in [Jane's] decision to file her grievance," but this was not inconsistent with her claim that she did not consent to unprotected sex.

John appealed the decision under CMC's procedures. His appeal was denied. John was suspended from CMC for one year and placed on probation for an additional year. He was ordered to undergo psychological counseling, prohibited from consuming alcohol at CMC until his 21st birthday, and barred from the Scripps campus unless granted permission by the Title IX coordinators at CMC and Scripps. He was instructed to have no contact with Jane until his graduation or permanent separation from CMC.

### 3. Petition for writ of administrative mandate

John filed a petition for a writ of administrative mandate in the superior court seeking to set aside CMC's sanctions against him. The trial court denied the petition. The trial court found that John had received a fair hearing. The trial court found that notice was adequate, John had no right to cross-examine witnesses, John had an opportunity to review and respond to the witness statements and other evidence, and he failed to show prejudice from the investigator's decision not to grant his requests for additional investigative steps. The trial court rejected the argument that the investigator was biased by being a member of the Committee as well as an investigator. The trial court also found the Committee's decision was supported by substantial evidence, including Jane's statements and other evidence tending to support her version of events while discrediting John's.

The trial court entered judgment on December 15, 2016. John filed a motion for a new trial in light of the Fourth District

13

Court of Appeal's decision in *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055 (*Regents*), issued after the trial court had denied John's writ.[5] The trial court denied the motion. The court concluded that, under *Regents*, "procedural fairness . . . required an opportunity for [John] to directly or indirectly question Jane," and CMC provided such an opportunity by allowing John to submit questions for Jane to the investigator. Although the investigator had exercised her discretion not to ask any of the questions, the trial court found that John had failed to show any prejudice because the questions were irrelevant, of marginal value, or concerned issues already addressed adequately in the record.

John timely appealed.

## STANDARD OF REVIEW

" 'The remedy of administrative mandamus . . . applies to private organizations that provide for a formal evidentiary hearing.' " (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 237, fn. 9 (*USC*).) In cases that do not " 'involv[e] a fundamental vested right,' " we review the administrative decision (in this case, the Committee's decision) rather than the trial court's decision, " 'applying the same standard of review applicable in the trial court.' " (*Id.* at p. 239.) This standard has been applied to college disciplinary decisions involving sexual misconduct. (See *ibid.*; *Regents*, *supra*, 5 Cal.App.5th at p. 1072.)

---

[5] John also filed a motion for reconsideration, which the trial court denied as untimely because judgment had already been entered.

When reviewing the denial of a petition for writ of administrative mandate, we determine "whether the [Committee] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b)[6]; *USC*, *supra*, 246 Cal.App.4th at p. 239.) In this context, "fair trial" refers to a fair administrative hearing. (*Regents*, *supra*, 5 Cal.App.5th at p. 1073.) We review the fairness of the proceedings de novo, and the substantive decision for substantial evidence. (*Ibid.*)

## DISCUSSION

John argues that he was denied a fair hearing because "neither John nor the Committee [was] able to ask any questions of Jane, and therefore, the Committee had no basis for evaluating her credibility." We agree that Jane's not appearing at the hearing either in person or via videoconference or other means deprived John of a fair hearing where John faced potentially serious consequences and the case against him turned on the Committee's finding Jane credible.[7] Because this issue is determinative, we do not reach John's other challenges to the fairness of the hearing or the judgment.

---

[6] Further unspecified statutory references are to the Code of Civil Procedure.

[7] CMC argues that John forfeited this issue by not raising it in the trial court. John did raise it in his motion for a new trial. Regardless, it is a purely legal question that may be raised for the first time on appeal. (*People v. Shrier* (2010) 190 Cal.App.4th 400, 419.)

15

## I.    Relevant Case Law

"[C]ase law does not plainly elucidate the specific components of a fair hearing" in a student disciplinary proceeding.  (*Regents*, *supra*, 5 Cal.App.5th at p. 1078.)  In determining those components, courts have recognized competing concerns.  On the one hand, an accused student has an interest " 'to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. . . . Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed.  The risk of error is not trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.' " (*USC*, *supra*, 246 Cal.App.4th at p. 240.)  On the other hand, " '[a] formalized hearing process would divert both resources and attention from a university's main calling, that is education.  Although a university must treat students fairly, it is not required to convert its classrooms into courtrooms.' " (*Regents*, *supra*, at p. 1078.)  Disciplinary proceedings involving sexual misconduct must also account for the wellbeing of the alleged victim, who often "live[s], work[s], and stud[ies] on a shared college campus" with the alleged perpetrator.  (*USC, supra*, at p. 245; see also *Regents*, *supra*, at p. 1085 [analyzing disciplinary procedures by "[b]alancing [the university's] desire to protect victims of sexual misconduct with the accused's need to adequately defend himself or herself "].)

These competing concerns have shaped the jurisprudence addressing an accused student's ability to confront and question a complaining witness in university sexual misconduct proceedings.

The first California case to discuss it was *USC*, in which a student disciplined by a university for sexual assault challenged the proceedings under section 1094.5 on a number of bases, including that he was not "allowed to cross-examine witnesses or otherwise test the credibility, knowledge, and recollection of the witnesses against him." (*USC*, *supra*, 246 Cal.App.4th at p. 240.) In that case, the university had not provided a hearing at all, but instead conducted an "investigation by interviewing witnesses and writing its report recommending penalties," which the student then appealed to an "Appeals Panel." (*Ibid.*)

The court " 'reject[ed] the notion that as a matter of law every administrative appeal . . . must afford the [accused] an opportunity to confront and cross-examine witnesses.' " (*USC*, *supra*, 246 Cal.App.4th at p. 245.) In cases "addressing sexual assault involving students who live, work, and study on a shared college campus, cross-examination is especially fraught with potential drawbacks," including the concern that " '[a]llowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment.' " (*Ibid.*)

In a footnote, the *USC* court noted "alternate ways of providing accused students with the opportunity to hear the evidence being presented against them without subjecting alleged victims to direct cross-examination by the accused," such as "placing a screen between the accuser and the accused," or having the parties hear witness testimony over closed-circuit television in a separate room or on a recorded tape. (*Id.* at p. 245, fn. 12.) But the court ultimately did not rule on the question of cross-examination, instead holding that the student was entitled to writ relief because the university failed to provide adequate

17

notice of the charges, had denied him access to the evidence against him unless he affirmatively requested it in writing, and had not provided the student "any opportunity to appear directly before the decisionmaking panel to rebut" that evidence; further, the disciplinary decision was not supported by substantial evidence. (*Id.* at pp. 248, 253.)

*Regents* is the second and, as far as we have discovered, the only other California case addressing whether a fair hearing includes the ability of a student accused of sexual misconduct to question the complaining witness.[8]  In *Regents*, the university held a hearing at which both the accused student and the complaining witness appeared, although they were separated by a screen and could not see one another. (*Regents*, *supra*, 5 Cal.App.5th at pp. 1081, 1093.)  The university's procedures allowed the parties to "provide written questions to the review panel chair or review officer to be asked of the other party or witnesses at the chair's or review officer's discretion." (*Id.* at

_____

[8]  *Regents* concerned a public university " 'subject to federal constitutional guarantees,' " (*Regents*, *supra*, 5 Cal.App.5th at p. 1078), whereas CMC, as a private college, generally is not subject to the constitutional requirements of procedural due process.  (See *Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 632.)  Due process jurisprudence nevertheless may be "instructive" in cases determining fair hearing standards for student disciplinary proceedings at private schools.  (*USC*, *supra*, 246 Cal.App.4th at p. 245.)  In citing to such jurisprudence, however, we do not intend to suggest that the fair hearing requirements under section 1094.5 are in all ways equivalent to those under the federal and California Constitutions, a question we need not address to resolve this appeal.

p. 1081.)  The accused student submitted 32 written questions for the complaining witness, of which the panel chair asked nine. (*Id.* at p. 1067.)  On appeal, the student argued that the university's procedures " 'completely eliminated [his] significant right' " to cross-examine the complaining witness.[9] (*Id.* at p. 1084.)  He also "implie[d] his ability to cross-examine [the complaining witness] was unfairly hampered" by the separating screen, which the student claimed prevented him and the panel from viewing the witness during her testimony. (*Id.* at p. 1093.)

The court concluded that requiring the student to question the complainant indirectly through the panel did not render the hearing unfair.  The court noted that "[t]here is no requirement under California law that, in an administrative hearing, an accused is entitled to cross-examine witnesses," but "in the instant matter, where the Panel's findings are likely to turn on the credibility of the complainant, and respondent faces very severe consequences if he is found to have violated school rules, we determine that a fair procedure requires a process by which the respondent may question, if even indirectly, the complainant." (*Regents*, *supra*, 5 Cal.App.5th at p. 1084.)  The court repeated the concern in *USC* that direct cross-examination could be traumatic or intimidating for the complaining witness; given the need to "[b]alanc[e] [the university's] desire to protect victims of sexual misconduct with the accused's need to

---

[9] In *Regents*, the trial court granted the student's writ petition, so the university was the appellant with the student arguing in defense of the trial court's granting of the writ. (*Regents*, *supra*, 5 Cal.App.5th at pp. 1058-1059.)

19

adequately defend himself or herself," the court concluded that "the mechanism [the university] provided [the accused student] here, does not, simply as a procedural concern, cause us to question the fairness of the hearing." (*Id.* at p. 1085.) The court then analyzed whether the panel chair's decision not to ask all of the student's requested questions was prejudicial and concluded it was not. (*Id.* at pp. 1084-1093.)

The court also rejected the claim that the screen concealing the parties from one another made the hearing unfair, noting that such a method "limit[ed] the potential of trauma to the complainant" and "did not prejudice or otherwise hamper [the student's] ability to cross-examine [the complainant] to the point that it made the hearing unfair." (*Regents*, *supra*, 5 Cal.App.5th at p. 1093.) Although the student claimed the screen also concealed the complainant from the review panel, the court found no support for this in the record. (*Ibid.*)

The United States Court of Appeals for the Sixth Circuit addressed the question of cross-examination in university sexual misconduct proceedings in *Doe v. University of Cincinnati* (6th Cir. 2017) 872 F.3d 393 (*Cincinnati*). As in *Regents*, the university's procedures permitted the accused student to question witnesses indirectly by submitting questions to the hearing panel. (*Cincinnati*, at p. 396.) The complaining witness chose not to appear, however, which the accused student did not know in advance of the hearing. (*Id.* at p. 397.) Thus the accused student had no opportunity to question her, indirectly or otherwise. (*Ibid.*) The review panel nonetheless found the accused student culpable based on the complaining witness's previous statements to investigators, which were summarized in a written report presented to the panel. (*Id.* at pp. 396-397.)

The Sixth Circuit held that the proceedings did not comport with due process. While acknowledging that cross-examination " 'generally has not been considered an essential requirement of due process in school disciplinary proceedings,' " (*Cincinnati, supra*, 872 F.3d at p. 400), the court stated that " '[t]he ability to cross-examine is most critical when the issue is the credibility of the accuser.' " (*Id.* at p. 401.) In contrast, a university might not have to permit witness questioning if the case against the accused student " 'd[oes] not rely on testimonial evidence' " from the complainant, or when the accused student "admits the 'critical fact[s]' against him." (*Id.* at p. 405.)

The court concluded that the case presented a "credibility contest" in which one party claimed the sex was consensual while the other claimed it was not. (*Cincinnati, supra*, 872 F.3d at p. 401.) "Given the parties' competing claims, and the lack of corroborative evidence to support or refute [the complaining witness's] allegations, the present case left the [review] panel with 'a choice between believing an accuser and an accused.' " (*Id.* at p. 402.) Under those circumstances, "[a]llowing [the accused student] to confront and question [the complaining witness] through the panel would have undoubtedly aided the truth-seeking process and reduced the likelihood of an erroneous deprivation." (*Id.* at p. 404.)

The court rejected the university's argument that the accused student had sufficient opportunity to challenge the complaining witness's credibility by disputing her claims and drawing attention to inconsistencies in her statements to the investigators: "[The university] assumes cross-examination is of benefit only to [the accused student]. In truth, the opportunity to question a witness and observe her demeanor while being

21

questioned can be just as important to the trier of fact as it is to the accused." (*Cincinnati*, *supra*, 872 F.3d at p. 401.) "Evaluation of a witness's credibility cannot be had without some form of presence, some method of compelling a witness 'to stand face to face with the [fact finder] in order that it may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " (*Id.* at p. 402, alteration in original.)

The court recognized that university administrators are " 'ill-equipped' " to oversee traditional cross-examination, which "justifie[d] the requirement for written preapproved questions." (*Cincinnati*, *supra*, 872 F.3d at pp. 404-405.) Also, because "[a]rranging for witness questioning might . . . pose unique challenges given a victim's potential reluctance to interact with the accused student," the court emphasized that the university's procedures must only provide "a means for the [review] panel to evaluate an alleged victim's credibility, not for the accused to physically confront his accuser." (*Id.* at p. 406.) Thus, for example, it would be acceptable for a witness to appear via Skype rather than in person: "Indisputably, demeanor can be assessed by the trier of fact without physical presence, especially when facilitated by modern technology." (*Ibid.*)

22

## II. Analysis

We conclude that these cases distill to a set of core principles applicable to cases where the accused student faces a severe penalty and the school's determination turns on the complaining witness's credibility. First, the accused student is entitled to "a process by which the respondent may question, if even indirectly, the complainant." (*Regents*, *supra*, 5 Cal.App.5th at p. 1084.) Second, the complaining witness must be before the finder of fact either physically or through videoconference or like technology to enable the finder of fact to assess the complaining witness's credibility in responding to its own questions or those proposed by the accused student. (See *Cincinnati*, *supra*, 872 F.3d at pp. 401-402.)

These principles apply here. The "very severe consequences" in *Regents* primarily consisted of a suspension for a year and a quarter (*Regents*, *supra*, 5 Cal.App.5th at pp. 1058, 1084); this is analogous to the one-year suspension imposed on John. Also, the Committee's findings were "likely to turn on the credibility of the complainant" (*id.* at p. 1084) because (1) Jane and John were the only witnesses to the incident, and (2) without Jane's statements, there was no evidence that she had not consented to sex without a condom.

Thus, the "case left the [Committee] with 'a choice between believing an accuser and an accused.'" (*Cincinnati*, *supra*, 872 F.3d at p. 402.) A mechanism that would have permitted John to question Jane indirectly through the Committee "would have undoubtedly aided the truth-seeking process and reduced the likelihood of an erroneous deprivation." (*Id.* at p. 404.)

CMC claims that *Regents* and *Cincinnati* are inapplicable because this case does not present "a true he-said-she-said

23

credibility contest." Instead, CMC argues, the Committee "based its decision . . . on undisputed facts and facts corroborated by multiple witnesses." CMC identifies several facts that the Committee relied on that " 'corroborated [Jane's] allegations more than [John's].' " (Quoting the Committee's written decision.)

First, CMC argues that "the fact that [John] and [Jane initially] took pains to have protected sex," at least initially, "corroborated [Jane's] stated position that she did not want to have unprotected sex with [John]." Second, "the fact that [Jane] sustained serious injuries during the sexual encounter . . . corroborated [Jane's] testimony that [John] became rough during sex, that it hurt her, and that she protested and struggled to break free." Third, CMC argues that John's "own words and actions . . . undermined [John's] credibility, and in some instances directly supported [Jane's] allegations," such as John's statement that Jane was " 'not super into' having unprotected sex with him" or John's admission that he could not recall Jane's specific words or actions evidencing consent. CMC also refers to John's claim to Jane and others that he had no memory of the incident, and his asking Jane, "Did I assault you?" CMC contends that John's "revealing words and actions, and his implausible post-hoc justifications for those words and actions, gave the Committee sufficient reason to credit [Jane's] account over his."

CMC, however, does not contend that the above evidence by itself supported a finding that Jane withdrew consent, just that it "corroborated" or "supported" Jane's allegations that she withdrew consent. In other words, Jane's allegations were still crucial to the Committee's determination of misconduct, even if the Committee relied on other evidence to "corroborate" those

24

allegations.  The Committee said so itself when it "determined that the evidence presented corroborated [Jane's] allegations more than [John's]."  The investigator also emphasized in the FIR that, because "there [were] no first-hand witnesses to the alleged sexual assault," "determining [John's and Jane's] respective credibility . . . is critical."  Simply put, this was not a case that " 'd[oes] not rely on testimonial evidence' " from the complaining witness (*Cincinnati*, *supra*, 872 F.3d at p. 405) and was certainly one "likely to turn on the credibility of the complainant." (*Regents*, *supra*, 5 Cal.App.5th at p. 1084.)

CMC argues in the alternative that, even if under *Regents* John was entitled to question Jane indirectly, this was satisfied by CMC's procedures "allowing [John] to submit questions for the Investigator to ask witnesses based on the PIR."  Setting aside the issue that the investigator did not in fact ask any of John's proposed questions to Jane, CMC's argument ignores the Committee's own need to assess Jane's demeanor in responding to questions generated by the Committee or, indirectly, by John. This was the very benefit to oral testimony underlying the holding of *Cincinnati*.  (*Cincinnati*, *supra*, 872 F.3d at p. 401.)

Our Supreme Court acknowledged the importance of the ability to assess witness credibility in student disciplinary proceedings, albeit in the context of suspensions and expulsions from public primary and secondary schools.  In *John A. v. San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301 (*John A.*), the court interpreted the Education Code's requirement that evidence in expulsion proceedings " 'may be admitted and given probative effect only if it is the kind of evidence upon which reasonable persons are accustomed to rely

25

in the conduct of serious affairs.' " (*John A.*, *supra*, at p. 307, quoting Educ. Code, former § 48914, subd. (f).)[10]

The Supreme Court held that "a reasonable person in the conduct of serious affairs will not rely solely on written statements but will demand that witnesses be produced so that their credibility may be tested and their testimony weighed against conflicting evidence when their testimony appears readily available and there is no substantial reason why their testimony may not be produced." (*John A.*, *supra*, 33 Cal.3d at pp. 307-308.) Although *John A.* addressed a provision of the Education Code rather than the "fair trial" requirements of section 1094.5, it lends support to the principles expressed in *Cincinnati*.

CMC contends that "the Committee was able to assess the respective credibility of both parties because the Investigator— *who conducted each of the witness interviews*—was a voting member of the Committee and could answer other Committee members' questions regarding the witnesses' demeanors." However, CMC's grievance procedures state that "the Investigator *and* Community Representatives will make . . . findings of fact by majority vote and by a preponderance of the evidence." (Emphasis added.) All three members of the Committee are finders of fact, each with an equal vote. Indeed, CMC emphasized this in denying John's administrative appeal, stating that "[t]he investigator does not lead the Investigation and Review Committee meeting, nor does the investigator draft the Findings Report. [¶] . . . Each member of the committee has an equal vote." Thus, all must make

---

[10] This language appears in the current version of the Education Code under section 48918, subdivision (h)(1).

credibility determinations, and not simply approve the credibility determinations of the one Committee member who was also the investigator. Fairness required, therefore, that all three hear from Jane before choosing to believe her account over John's. Even if CMC's procedures permitted or required the investigator to make an initial credibility finding, we note that in *Regents* the investigator expressly did so in a report presented to the review panel (*Regents*, *supra*, 5 Cal.App.5th at p. 1064), yet the court nonetheless held that the accused student was entitled to question the complainant indirectly before the review panel at the hearing.[11] (*Id.* at pp. 1084-1085.)

CMC does not argue that allowing indirect questioning at the hearing would unduly burden the college or Jane. We are mindful, however, of the concerns raised in *USC* and *Regents* that a complainant's participation in the hearing may be traumatic or intimidating for him or her. (*USC*, *supra*, 246 Cal.App.4th at p. 245; *Regents*, *supra*, 5 Cal.App.5th at p. 1085.) We also acknowledge, as did *Cincinnati*, the burden of added procedures on the college, as well as the fact that a college, unlike a court, cannot compel a witness to appear. (*Cincinnati*, *supra*, 872 F.3d at pp. 404-405.)

In light of these concerns we emphasize, as did *Cincinnati*, that the school's obligation in a case turning on the complaining witness's credibility is to "provide a means for the [fact finder] to evaluate an alleged victim's credibility, not for the accused to

---

[11] In *Regents*, the review panel could hear testimony from witnesses, including the accused student and complainant, and thus also served a fact-finding function. (*Regents*, *supra*, 5 Cal.App.5th at p. 1080.)

physically confront his accuser." (*Cincinnati*, *supra*, 872 F.3d at p. 406.)  While we do not wish to limit the universe of ideas of how to accomplish this, we note that the mechanism for indirect questioning in *Regents*, including granting the fact finder discretion to exclude or rephrase questions as appropriate and ask its own questions, strikes a fair balance among the interests of the school, the accused student, and the complainant.  We have also discussed mechanisms by which the parties may be physically separate, including one or both parties appearing remotely via appropriate technology.

These procedures do not appear to be excessively burdensome; indeed, CMC's procedures already provide that the hearing format may be structured "to minimize or avoid any undue stress or burden" by permitting "participation by Skype or other means."  Today's technology also simplifies witness appearances when witnesses may no longer be at, or near the school.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to grant John's writ of administrative mandate.  John is awarded his costs on appeal.

CERTIFIED FOR PUBLICATION.


BENDIX, J.



We concur:



CHANEY, Acting P. J.



ZELON, J.*

---

* Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.