Filed 9/30/21; Certified for publication 10/19/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br>v.<br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | A159023<br><br>(Alameda County<br>Super. Ct. No. HG18897877) |

John Doe was a senior at University of California, Santa Barbara (UCSB), when fellow student Jane Roe reported that he engaged in dating violence against her in violation of University of California policy. John admitted that, after arguing with Jane for hours, he "grabbed her, screamed in her face and shook her" and "eventually dragged her out of the bed to the front door" of his home. Following an investigation, the university found John violated UC policy, and he was suspended for three years, resulting in a three-year hold of his degree and diploma. John petitioned for a writ of administrative mandate seeking to set aside the disciplinary decision and suspension, and the trial court denied the petition.

In this appeal, John contends UCSB failed to provide a fair process and the factual findings were not supported by substantial evidence. We affirm.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Relevant UCSB Policies and Procedures*

1.    <u>Policy on Sexual Violence and Sexual Harassment</u>

The UC Policy on Sexual Violence and Sexual Harassment issued January 1, 2016, (UC Policy) prohibits "dating violence," which is defined as "[c]onduct by a person who is or has been in a romantic or intimate relationship with the Complainant that intentionally, or recklessly, causes bodily injury to the Complainant or places the Complainant in reasonable fear of serious bodily injury."

2.    <u>Investigating and Adjudicating Complaints</u>

Each University of California campus has a Title IX Office responsible for receiving and responding to reports of sexual violence and sexual harassment.[1]  When an investigation is warranted, an investigator from the Title IX Office conducts the investigation (interviewing witnesses and gathering evidence) and then prepares a written investigative report with findings of fact and a recommendation as to whether any UC Policy has been violated.

In addition, although not described in the UCSB Procedures, after the initial investigation in this case, the Title IX Office offered the complainant and respondent (that is, Jane and John) a debrief interview in which they would be provided the names of the witnesses, a summary of the information

_____

[1] We describe the procedures for investigating and adjudicating claims in effect at the time Jane filed her complaint and John was disciplined. These were UCSB's "Implementing and Response Procedures for Reported Student Violations of the UC Policy on Sexual Violence and Sexual Harassment" issued January 4, 2016 (UCSB Procedures) and the UC "Policies Applying to Campus Activities, Organizations and Students" "Appendix E: Sexual Violence and Sexual Harassment Student Adjudication Framework" issued January 1, 2016.

gathered, and an opportunity to comment on the information and to request additional investigation. Any comments or new evidence from the debrief interviews would be considered and included in the investigative report.

The investigative report is sent to the Office of Judicial Affairs (OJA), which decides whether any policy violation occurred and assigns sanctions, if appropriate. Both the complainant and the respondent are permitted to schedule a meeting with the OJA or submit a written statement to address the investigative report before the OJA makes its determination.

After the OJA issues its decision, either party may appeal the decision to the Interpersonal Violence Appeal Review Committee (review committee). If the review committee upholds the OJA decision, there is no right to further administrative appeal. If the OJA decision is modified or overturned, either party may appeal to the Vice Chancellor of Student Affairs.

B.    *Incident and Complaint*

John Doe and Jane Roe agree that they were in a dating relationship for almost two years; that John broke up with Jane around June 2016; and that, after the breakup, they continued to have a sexual relationship with each other.[2] It is also undisputed that, on July 7, 2016, they argued, and John ended up grabbing Jane and dragging her out of his apartment. John called the police and reported that Jane would not leave his home, but when the police arrived, they detained John.

---

[2] Here, we note that the administrative record and appellate briefing refer to the complainant and respondent as Jane Roe and John Doe respectively, and we do the same. In addition, the witnesses in the investigation are referred to as Witness 1, 2, and so on to protect their privacy.

3

Following this incident, the Title IX Office received a mandated report of possible dating violence involving John and Jane.[3]  In September 2016, Jane filed a complaint against John.  The next month, the Title IX Office initiated a formal investigation.

The Title IX Office sent John notice of the complaint informing him that Jane alleged he committed dating violence against her when he "physically assaulted her on or around July 7, 2016."[4]

C.    *Investigation*

The Title IX Office assigned Kristi Johnson to investigate Jane's complaint.  She conducted the bulk of the investigation, interviewing Jane and six witnesses.  She also tried to schedule an interview with John, but he was studying abroad and had limited phone and internet availability, so he agreed to respond to the allegations in writing.

At some point, Johnson left her position, and Brian Quillen took over the investigation.  Quillen attempted to interview a seventh witness, but that person declined to participate in the investigation.

The next steps in the investigation were to conduct debrief interviews with Jane and John and to prepare the investigative report.  In the debrief interview, the parties would be given a summary of the evidence and an

---

[3] The report, filed by the UC Police Department, stated John "got into an argument with his ex-girlfriend.  The argument was about their open relationship.  John Doe shook the victim, causing her to fall to the ground. John Doe then dragged the victim by her feet to the door.  John Doe booked into [Santa Barbara Jail]."

[4] Jane also alleged John subsequently engaged in stalking when he "repeatedly show[ed] up at her residence when [he] knew she would be alone and against her wishes."  The UC Policy defines and prohibits "stalking"; the stalking allegation, however, was not sustained by the Title IX investigator and is not germane to John's appeal.

4

opportunity to comment.  In late February 2017, Quillen began attempting to schedule a debrief interview with John.  He continued to email John in March and April but was unable to schedule a debrief.  After John failed to respond to an email sent on May 1 asking for his availability to schedule a debrief, Quillen interpreted John's overall lack of response as "a decision not to participate in the debrief interview," and he prepared the investigative report without having conducted a debrief interview with John.

D.    *Investigative Report*

On June 23, 2017, Quillen completed the investigative report and sent it to the Office of Judicial Affairs.  The report summarized Jane's interview and included John's written statement as an exhibit.

1.    Jane's Interview

Jane reported that, on July 7, 2016, she and John were at a house party, and they played a drinking game.  Jane overheard a girl ask John if Jane was his girlfriend.  John said she was not his girlfriend and he had great relationships with all his ex-girlfriends.  Jane interjected, "Really?  Are you [sexually] active with all of them?"  Jane and John began to argue.  After the party, they went to John's house.  Jane asked John if she could spend the night, and he agreed.  John was drunk and appeared angry.  He began arguing with Jane and told her to leave.  Jane told John the argument was over and that she was exhausted.

John placed his hands on Jane's shoulders, and she fell to the ground.  He shook her for one to two minutes, and her head hit the floor repeatedly.  John lifted her up, and she fell again.  He shook her again and pulled her up.  John's housemate, Witness 3, opened his bedroom door and asked what was going on.  John said, "this doesn't pertain to you," and told him to close his door.

5

John dragged Jane by her feet out of his bedroom, through a hallway, and to his front door. Her head landed on his front door. John then called the police, reporting there was a female in his home who refused to leave.

When the police arrived, they talked to Jane about what happened and then arrested John.

Jane had a bump on her head, and she felt achy in her arms and shoulders.

2.     John's Written Statement

John wrote that, on the night in question, he and Jane went to a party, and they both had a few drinks. A girl asked John if Jane was his girlfriend, and he said they were broken up but still friends. Jane interrupted that she and John were "still fucking" and "basically still dating." This started an argument that continued at John's house. The argument lasted three or four hours. John wrote, "I was extremely upset that I had, yet again, wasted hours of my life just to explain myself to her because her feelings were hurt over her own interpretation of my low level of detail in communication with a stranger."

John changed his mind about letting Jane sleep at his house, and he asked her "many, many times to leave." He offered to walk her to her house, which was less than two blocks away, but she would not leave. Jane tried to bargain with John to stay, saying she would leave before he woke up and that she would sleep in his roommate's bed.[5]

John wrote what happened next: "[Jane] would not listen to my requests to leave my house so I threatened to call the police. Then she lay

---

[5] John had a housemate (Witness 3), who was at home in a separate bedroom. John also had a roommate, with whom he shared a bedroom; the roommate was out of town that night.

down in my roommate's bed and pretended to be asleep. This is a complete violation of my privacy and now it involves my roommate's property. I should have kept a level head and simply called the police, but because of the lengthy and completely unproductive argument[,] I grabbed her, screamed in her face and shook her to 'wake her up' and eventually dragged her out of the bed to the front door while she was still pretending to be asleep. Then I called the cops and they detained me (it was not an arrest) for trying to defend the security of my own house while they escorted the trespasser back to her house."

John wrote, "The charges were dropped because the legal defense I would have used was that I did not intend to do harm, I intended to remove a trespasser from my home thus making the 'victim' indefensible. . . . The details of these legal proceedings directly refute the claims that I 'committed dating violence against [Jane] by intentionally or recklessly causing bodily injury to [her] or placing her in reasonable fear of serious bodily injury.' Had I done so, I would have been convicted of the charges for which I was only detained. I have a loose understanding of these laws; however the charge was listed as a misdemeanor. Had there been any serious injury, like bleeding or noticeable bruising or broken bones, the charge would have been a felony. As I have mentioned above, the charges were dropped specifically because the DA had strong reason to believe that the bodily injury was not intentional."

3.     Additional Evidence

The investigative report also included summaries of witness interviews, Jane's response to the evidence at her debrief interview, and documents collected in the investigation.[6]

Witness 1, Jane's former roommate, reported that Jane complained about body soreness and emotional trauma after the incident.

John's housemate Witness 3 reported that he heard John and Jane when they came home from the party. He heard yelling and then what sounded like slapping. Witness 3 opened his door to see what was happening, and John said, "Don't worry. I have this under control." John appeared agitated but under control, and Jane appeared very passive and like she was very intoxicated. The police came and eventually took John away in handcuffs. Witness 3 did not believe John hurt Jane; at most, he believed Jane had minor floor burns.[7]

In her debrief interview, Jane denied John's claim that she was pretending to sleep when he shook her and dragged her. She reported that her body hit walls and pieces of furniture when John dragged her. Afterward, her head was "throbbing." Jane said John handled her "in a very painful, hurtful way." The District Attorney's Office called her the day after the incident and asked if she wanted to press charges. Jane declined.

---

[6] The documents attached as exhibits to the report included screenshots of text messages between John and Jane, a diagram of John's apartment drawn by Witness 3, and a Santa Barbara County Sheriff's Department certificate of detention. The certificate of detention states the Santa Barbara County District Attorney decided not to file an accusatory pleading against John on July 27, 2016, and, as result, when John was taken into custody on July 8, it was a detention, not an arrest.

[7] The remaining four witnesses did not provide statements relevant to this appeal.

8

Jane disputed Witness 3's description of her as very intoxicated, stating he misinterpreted "being dazed and in pain" with being drunk.

4.      Findings and Recommendations

Quillen determined there was sufficient evidence under a preponderance-of-the-evidence standard that John violated the UC Policy against dating violence.  He considered the two elements of dating violence: (1) a dating relationship between the parties and (2) intentional or reckless conduct that causes bodily injury to the complainant or places her in reasonable fear of serious bodily injury.  The first element was undisputed.

Quillen found the second element was met "based on the undisputed evidence that [John] physically assaulted [Jane]," quoting John's written statement that he "grabbed her, screamed in her face and shook her to 'wake her up' and eventually dragged her out of the bed to the front door while she pretended to be asleep."

Quillen found sufficient evidence that John caused bodily injury based on John's written statement alone.  He reasoned, "[John] implicitly admitted to causing bodily injury through his conduct.  In his written statement, [John] wrote, 'I did not intend to do harm, I intended to remove a trespasser from my home [. . .]'  He further wrote that the District Attorney did not file criminal charges because they 'had strong reason to believe that the bodily injury was not intentional.'  Those two statements, when considered in conjunction with his description of his own conduct, constitute an implicit admission that he caused bodily injury."[8]

_____

[8] Quillen noted that John's "admission in this respect is consistent with [Jane]'s description of the bodily harm he caused her.  [Jane] stated that her head was 'throbbing' after having repeatedly hit the floor, which caused a bump on her head the next day."

9

Quillen also found sufficient evidence that the conduct was reckless based on John's written statement alone. Considering John's "account alone, the evidence shows that he recklessly caused bodily injury to [Jane]. The act of grabbing, shaking and dragging the body of another individual across a furnished apartment in such an angry manner as to cause a housemate to ask what was happening constitutes behavior that [John] knew or should have known was likely to cause bodily injury to [Jane]."[9]

Quillen sent John a copy of the investigative report and informed him of his right to meet with the OJA and/or submit a written statement responding to the report, its findings, and potential sanctions. John did not request a meeting or submit a statement to the OJA.

E. *Disciplinary Decision*

On July 10, 2017, Assistant Dean Suzanne Perkin, acting on behalf of the Office of Judicial Affairs, issued her decision. She concurred with Quillen's findings and recommendations and found John responsible for violating the UC Policy against dating violence. Perkin suspended John from UCSB for three years. Because John had completed the requirements for his degree, the suspension resulted in a three-year hold of his degree and diploma, with exclusion from campus.

---

[9] We note that Quillen accepted Jane's account of what happened and determined that John's conduct was intentional or reckless based on her version of events. He found John's claim that he "did not intend to do harm" "implausible in light of [Jane]'s account of his conduct." However, Quillen also determined, in the alternative, that John's account alone showed recklessness even assuming he did not intend to harm Jane.

F.    *Administrative Appeal*

On July 24, 2017, John submitted an appeal to the review committee on the grounds of procedural error, unreasonable decision based on the evidence, and disproportionate discipline.

For his claim of procedural error, John argued the investigation took far too long and involved multiple investigators and he was not given a fair chance to meet with investigators for a debrief interview. For his claim of unreasonable decision, John claimed there was a finding that Jane "sustained severe injuries" and such finding was not true. Finally, he urged that a three-year freeze on his diploma was excessive where there were "no serious injuries."

On September 21, 2017, the review committee held a hearing on John's appeal. John appeared in person with his advisor Mark Hathaway (his attorney in this appeal). Jane attended by video conference. John made opening and closing statements and the review committee questioned John, Jane, Quillen, and Perkin.

On October 9, 2017, the review committee denied the appeal in an eight-page decision.

The review committee rejected John's claim of procedural error, finding that John "was given ample opportunity to participate in a debrief interview and that his ultimate lack of participation did not constitute a procedural error." As to John's claim that the finding of "severe" injury was unreasonable, the committee explained that the definition of dating violence does not require "severe" injury.

G.    *Petition for Writ of Administrative Mandate*

On March 21, 2018, John filed a petition for writ of mandamus to set aside the disciplinary decision, citing Code of Civil Procedure section 1094.5

11

(§ 1094.5). He argued UCSB provided him no opportunity to question Jane, improperly withheld evidence from him, and failed to follow its own written policies. He further argued the findings of fact were not supported by substantial evidence.

Following briefing and oral argument, the trial court denied the petition in February 2019.

John moved for reconsideration on the ground the trial court did not evaluate the petition in accordance with new case law, citing *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212 (*USC II*) *Doe v. Allee* (2019) 30 Cal.App.5th 1036 (*Allee*). These cases impose greater procedural requirements in university disciplinary proceedings where issues of witness credibility are central to the fact finding.

In *USC II*, the court held, "Where a student faces a potentially severe sanction from a student disciplinary decision and the university's determination depends on witness credibility, the adjudicator must have the ability to observe the demeanor of those witnesses in deciding which witnesses are more credible." (*USC II, supra,* 29 Cal.App.5th at p. 1234.)

In *Allee*, the court held, "when a student accused of sexual misconduct faces severe disciplinary sanctions[ ] and the credibility of witnesses . . . is central to the adjudication of the allegation, fundamental fairness requires . . . the university provide a mechanism by which the accused may cross–examine those witnesses, directly or indirectly, at a hearing in which the witnesses appear in person or by other means (e.g., videoconferencing) before a neutral adjudicator with the power independently to find facts and make credibility assessments." (*Allee, supra,* 30 Cal.App.5th at p. 1069.)

The trial court granted John's motion for reconsideration but denied the petition after reconsideration. The court reasoned, "[T]he facts of this

12

case are distinguishable from both USC II and Allee, in that John Doe submitted a detailed written response that admitted the essential allegations in Jane Roe's complaint. . . . The court declines to find, based on the evidence in the record before the court, that the 'credibility of witnesses' was central to the adjudication of the allegations as it was in USC II and Allee."

**DISCUSSION**

A.    *Standard of Review*

A University of California student may challenge a disciplinary sanction of suspension or expulsion by a petition for writ of administrative mandate. (E.g., *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1058, 1070 (*UCSD*) [student petitioned for writ of administrative mandate to challenge his suspension from UC San Diego for one year and one quarter after he was found to have digitally penetrated a classmate without her consent]; *Berman v. Regents of University of California* (2014) 229 Cal.App.4th 1265, 1267, 1270 [UC San Diego student petitioned for writ of administrative mandate to set aside his two-quarter suspension for hitting another student]; *Goldberg v. Regents of University of California* (1967) 248 Cal.App.2d 867, 870, 873–874 [noting mandate was the appropriate remedy where UC Berkeley students challenged on First Amendment grounds their suspensions and dismissals for student conduct violations].)

To prevail, a petitioner seeking a writ of administrative mandate must show the agency (in this case, UCSB) (1) acted without, or in excess of, its jurisdiction, (2) deprived the petitioner of a fair administrative hearing, or (3) committed a prejudicial abuse of discretion. (§ 1094.5, subd. (b); *Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239 (*USC I*) [section 1094.5's "fair trial" requirement means there must be a fair

13

administrative hearing].)[10]  "Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*; see *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169.)

When, as here, an administrative decision does not involve a fundamental vested right, the trial court reviews the record to determine whether the findings and decision are supported by substantial evidence.[11] (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1057.)  We review the agency's decision, rather than the trial court's decision, applying the substantial evidence standard.  (*Id.* at p. 1058.)

When reviewing a claim that a petitioner did not receive a fair hearing, we uphold the trial court's decision if it is supported by substantial evidence, but when the evidence is substantially undisputed, the issue becomes a question of law, which we review de novo.  (*Pinheiro v. Civil Service Com. for County of Fresno* (2016) 245 Cal.App.4th 1458, 1464; see *Clark v. City of Hermosa Beach*, *supra*, 48 Cal.App.4th at pp. 1169–1170.)

---

[10] John contends he was denied a "fair process."  The fair administrative hearing protected under section 1094.5 is sometimes referred to as "fair process" (e.g., *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1014; *USC II*, *supra*, 29 Cal.App.5th at p. 1228 or "fair procedure" (e.g., *USC I*, *supra*, 246 Cal.App.4th at p. 240; *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1445.)

[11] John does not claim his suspension in this case substantially affected a fundamental vested right.  (See *USC II*, *supra*, 29 Cal.App.5th at p.1231 ["[a] university disciplinary proceeding concerning sexual misconduct does not involve a fundamental vested right"].)

B.      *Fair Process*

Generally, a fair process requires notice of the charges and an opportunity to be heard.  (*USC I*, *supra*, 246 Cal.App.4th at p. 240.)  " 'At the very minimum, therefore, students facing suspension . . . must be given some kind of notice and afforded some kind of hearing.' "  (*Ibid.*, quoting *Goss v. Lopez* (1975) 419 U.S. 565, 579 (*Goss*).)[12]  Further, "a university is bound by its own policies and procedures."  (*UCSD*, *supra*, 5 Cal.App.5th at p. 1078.)  Due process requires a "university's procedures [to] ' " 'be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," [citation] . . . to insure that they are given a meaningful opportunity to present their case.' " ' "  (*Ibid.*)

John contends he was denied a fair process because (1) the fact finder did not observe the witnesses and John was not allowed to cross-examine witnesses, (2) UCSB withheld evidence from him during its investigation, and (3) the review committee failed to follow its own policy requiring an independent review of the disciplinary decision.  His claims lack merit.

1.      Observation and Cross-Examination of Witnesses

a.      *Case Law*

Courts have observed that student disciplinary proceedings in university settings do not require "all the safeguards and formalities of a criminal trial" (*UCSD*, *supra*, 5 Cal.App.5th at p. 1078) and a university " 'is

---

[12] In *Goss*, the United States Supreme Court held, in the context of temporary suspensions from public high school, that "some kind of notice" and "some kind of hearing" were required under the federal Due Process Clause.  (419 U.S. at p. 579.)  The court contemplated that the hearing would often be no more than an informal discussion about the alleged misconduct between the school disciplinarian and the student "minutes after [the alleged misconduct] has occurred" where the student would be given "an opportunity to explain his version of the facts."  (*Id*. at p. 582.)

not required to convert its classrooms into courtrooms.' " (*Ibid*.; *Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1066 (*CMC*) [quoting *UCSD*]; *Doe v. Occidental College*, *supra*, 37 Cal.App.5th at p. 1018 [same].) In *USC I*, the court recognized that a purely adversary model is not generally required to meet due process and that not every administrative hearing requires cross-examination of witnesses. (246 Cal.App.4th at pp. 244–245.) Nonetheless, the trend in case law has been to expect more adversarial and criminal-trial-like procedures when a student is accused of sexual misconduct and the complainant's credibility is questioned.

For example, in November 2016, the court in *UCSD* held that when the "findings are likely to turn on the credibility of the complainant, and [the] respondent faces very severe consequences if he is found to have violated school rules, . . . a fair procedure requires a process by which the respondent may question, if even indirectly, the complainant." (*UCSD*, *supra*, 5 Cal.App.5th at p. 1084.) There, the court approved a procedure under which the accused student was permitted to submit written questions, which a panel then asked of the complainant. (*Id*. at pp. 1084–1085.)

In August 2018, the court in *CMC*, *supra*, 25 Cal.App.5th at page 1070, held, "[W]here the accused student faces a severe penalty and the school's determination turns on the complaining witness's credibility," "the complaining witness must be before the finder of fact either physically or through videoconference or like technology to enable the finder of fact to assess the complaining witness's credibility in responding to its own questions or those proposed by the accused student."

In December 2018, the court decided *USC II*, adopting *CMC*'s holding that the fact finder must observe witnesses when the disciplinary

16

determination turns on credibility. (*USC II*, *supra*, 29 Cal.App.5th at pp. 1233–1234.)

In January 2019, the court in *Allee*, *supra*, 30 Cal.App.5th at page 1069, identified additional procedures required in sexual misconduct cases where the credibility of witnesses is central to deciding the allegations.

        b.     *Senate Bill No. 493*

More recently, in 2020, the Legislature passed Senate Bill No. 493 (2019–2020 Reg. Sess.), adding section 66281.8 to the Education Code. Subdivision (g)(1) of the new statute (§ 66281.8(g)(1)), provides, "Any case law interpreting procedural requirements or process that is due to student complainants or respondents when adjudicating complaints of sexual or gender-based violence, including dating or domestic violence, at postsecondary educational institutions in the State of California shall have no retroactive effect."

Here, John's administrative disciplinary proceeding concluded in October 2017. We asked the parties for supplemental briefing on the effect of the new law on this appeal. Respondent (the Regents) argues section 66281.8(g)(1) means *Allee*, *USC II*, *CMC*, and similar cases that post-date UCSB's disciplinary decision against John "shall have no effect in this matter" "to the extent [these] cases created new procedural requirements." John agrees with respondent that that was the Legislature's intent, but he takes the position section 66281.8(g) is an unenforceable "improper judicial opinion" and "an unconstitutional invasion on the separation of powers." John further argues the principles underpinning the recent case law "precede those decisions and should apply in this case." The question of Senate Bill No. 493's effect on court review of university disciplinary proceedings is

currently pending before our Supreme Court in *Boermeester v. Carry*, review granted, September 16, 2020, S263180.

We need not determine the meaning and application of section 66281.8(g) to resolve this appeal because we conclude John fails to show he was provided an unfair process even if we assume *Allee*, *USC II*, and other similar cases apply in this case.

          c.     *Analysis*

John claims he was denied a fair process because the fact finder, Quillen, did not personally observe the witnesses and because the proceedings did not include an opportunity to cross-examine witnesses before a neutral adjudicator, relying on *USC II*, *CMC*, and *Allee*.

But these cases only impose their additional procedural requirements where the credibility of witnesses is central to the disciplinary decision.[13] (*Allee*, *supra*, 30 Cal.App.5th at pp. 1039, 1061 [procedures required when "the credibility of witnesses (whether the accusing student, other witnesses, or both) is central to the adjudication of the allegation"]; *USC II*, *supra*, 29 Cal.App.5th at p. 1232 [procedures required "[w]here a university's determination turns on witness credibility"]; *CMC*, *supra*, 25 Cal.App.5th at p. 1070 [procedure required when "the school's determination turns on the complaining witness's credibility"]; see also *UCSD*, *supra*, 5 Cal.App.5th at p. 1084 [procedure required when the "findings are likely to turn on the credibility of the complainant"].)

---

[13] The cases also require that the potential discipline be "severe." (*Allee*, *supra*, 30 Cal.App.5th at p. 1069; *USC II*, *supra*, 29 Cal.App.5th at p. 1234; CMC, *supra*, 25 Cal.App.5th at p. 1070; *UCSD*, *supra*, 5 Cal.App.5th at p. 1084.) Respondent does not dispute that a three-year suspension is a severe sanction.

In John's case, however, credibility of witnesses was not central to the determination because, as the trial court noted, John "submitted a detailed written response that admitted the essential allegations" of Jane's complaint. This is not a "he-said, she-said" case because the material facts are not in dispute. (Cf. *Knight v. South Orange Community College District* (2021) 60 Cal.App.5th 854, 866 [observing that most sexual misconduct allegations of non-consensual sexual activity are he-said, she-said cases that turn on credibility].)

In his written statement defending himself against the allegation of dating violence, John admitted to engaging in conduct that plainly sounds as though it would cause bodily injury, yet he never claimed that Jane suffered no injuries or that he took care not to injure her as he dragged her out of his house. He disputed only that he acted with the specific intent to harm Jane and that her injury was serious. Again, John's own version of his conduct was: "I grabbed her, screamed in her face and shook her to 'wake her up' and eventually dragged her out of the bed to the front door while she was still pretending to be asleep." John's written statement alone provided sufficient evidence to find he recklessly caused bodily injury to Jane.[14]

---

[14] John's description of shaking Jane while she was apparently motionless, "dragg[ing] her out of the bed," and then continuing to drag her (as opposed to, say "carrying" her, which would not connote a body trailing along the surface of a floor) from a bedroom through a common area to a front door is sufficient to infer his conduct caused bodily injury. Moreover, we agree with Quillen's analysis that John's statements, "[h]ad there been any *serious* injury . . . the charge would have been a felony" and "the charges were dropped specifically because the DA had strong reason to believe that *the bodily injury was not intentional*," implicitly acknowledge there was bodily injury. (Italics added.) The clear import of these statements is that Jane was injured, but her injury was not "serious" and John did not intend to harm her.

We reject John's argument that Jane's statements were nonetheless "crucial" to the determination of misconduct. (Cf. *CMC*, *supra*, 25 Cal.App.5th at p. 1071 [the complainant's allegations were crucial to the determination of misconduct, and live questioning was therefore required, where other corroborating evidence by itself was insufficient to find misconduct].) Had Jane declined to participate in the investigation, John's written statement alone would have been sufficient to find he committed dating violence, and John's statement together with the mandatory police report and the statements of Witness 3 and Witness 1 would have been more than sufficient. In other words, Jane's statement was not crucial to the determination of misconduct.

Thus, we conclude the procedures mandated in *UCSD*, *CMC*, *USC II*, and *Allee* were not required here because the disciplinary decision did not turn on determinations of witness credibility.

2. Withholding Evidence

"[C]ommon law requirements for a fair hearing under section 1094.5 do not allow an administrative board to rely on evidence that has never been revealed to the accused." (*USC I*, *supra*, 246 Cal.App.4th at p. 247.)

John argues UCSB unfairly withheld evidence from him when (1) "it relied on evidence provided only to [Jane]" and (2) "it relied on evidence that was not available at the debrief interview."

a. *Lack of Debrief Interview*

The first part of his argument is based on the fact he did not have a debrief interview. John asserts the university unfairly cut off his chance to respond "after setting the precedent that he would be told before they did so." We are not persuaded.

20

Quillen began attempting to schedule a debrief interview with John on February 24, 2017. In his initial email on the subject, Quillen explained the purpose of the debrief interview was "to present you with a summary of the information I learned during the investigation and provide an opportunity for you to respond to that information." He asked whether John was available in the following week to meet. On Monday, February 27, John responded, suggesting times he was available Tuesday, Wednesday, and Thursday. Quillen wrote back the next day, scheduling the debrief interview for Thursday at a time John said he was available. The next day, Wednesday, March 1, John wrote that he "just remembered" that he had a class then, and the debrief interview was postponed.

In March and April, Quillen continued to email about scheduling a debrief interview, always asking John for his availability. Twice John failed to respond, and once he did respond but wrote that he did not know his schedule (and so he did not offer any available times for a debrief interview).

On Tuesday, April 18, 2017, Quillen wrote again asking for John's availability for a debrief interview the following week; he warned that if John did not respond by April 25, "I'll assume that you're declining to participate in the interview and [I] will proceed to the next step in the process." On Tuesday, April 25, at 4:05 p.m., John wrote that he was busy during the day but, "I'm free after 4pm every day except for Wednesday and Thursday this week" and "Friday this week also might not work." In other words, John was not available that week.

Since John indicated he was not available for the rest of the week and Quillen was going to be out of the office beginning the following week, Quillen wrote to John on Thursday, April 27 explaining that another investigator, Stephanie Yahyavi, would conduct the debrief interview. The following

21

Monday, May 1, Yahyavi emailed John to schedule the debrief, asking for his availability over the next two weeks. John never responded. Over the time Quillen tried to schedule an interview with John, he found him "nonresponsive and noncommittal," and he interpreted John's behavior as "a decision not to participate in the debrief interview."

John conceded in his administrative appeal that he "forgot to respond" to Yahyavi's email. He explained to the review committee, "I closed that email [from Yahyavi] and I didn't think about it again because during the last month of my time here at UCSB . . . I prioritize[d] my graduation."

On this record, we agree with the review committee, which considered the same argument and determined that John "effectively denied himself the opportunity to participate in a debrief interview."

We reject John's argument that it was unfair of the investigators to stop attempting to schedule an interview with him when they initially gave him a deadline. The Title IX Office tried to schedule a debrief interview with John over the course of more than three months. We cannot say the process was unfair merely because John mistakenly seemed to believe the Title IX Office would wait until he graduated to schedule an interview even though he made no effort to communicate with them.

John also points out that Jane had her debrief interview on May 23, 2017, suggesting the Title IX Office stopped attempting to schedule an interview with him while continuing to offer an interview to Jane. Quillen responded to this argument at the appeal hearing. He explained he sent Jane an email on April 18 warning her that if he did not hear from her by April 25, he would move on to preparing the investigative report. This was the same date Quillen sent John a warning email with the April 25 deadline to respond. The difference between John and Jane was that Jane "continued

22

to respond, continued to keep the conversation going related to scheduling her debrief. . . . So it was a constant flow of communication between when I sent the cutoff email . . . through when the debrief actually took place." John "on the other hand, declined to respond." Thus, the Title IX Office continued to communicate with Jane because she responded to the office about scheduling a debrief interview, which John admittedly did not do. This does not reflect unfair treatment. Had John responded to Yahyavi's May 1 email, he likely would have been able to schedule a debrief interview in May as Jane did.

Next, John argues the university should have scheduled his interview "or found another way to provide the information," given that it "could have easily been provided . . . in electronic format." John does not suggest that he ever asked the Title IX Office to send the information in electronic format. Nor did he argue to the review committee that the university should have provided the information even without a debrief interview. In this circumstance, the argument is forfeited. (See *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 787 [due process claim forfeited where the claim was not raised at the administrative hearing]; *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 548–549 [same].)

In any event, we cannot say the failure to provide John information in some alternative form amounted to an unfair process in this case. John relies on *USC I*, in which the court recognized that a student accused of misconduct should be presented the evidence against him. (*USC I*, *supra*, 246 Cal.App.4th at p. 246.) The court further held that requiring the student to request access to the evidence does not comport with fair process. (*Ibid*.) But *USC I* did not mandate any particular mechanism for the presentation of

23

evidence. Here, the university reached out many times to try to present the evidence to John in a debrief interview. John did not receive the information because of his own inaction, not because UCSB provided an unfair process.

### b.    *Evidence Not Available at Debrief Interview*

Next, John argues evidence was improperly withheld from him because Quillen's findings relied heavily on statements made by Jane during her debrief interview, which would not have been available to John even if he had received a debrief interview. The premise of this argument is not correct. Quillen explained at the appeal hearing that, even accepting John's "claims on their face *alone*[, I] still found that it presented a violation of policy." (Italics added.) Thus, the result would have been the same without Jane's debrief statements. In this circumstance, John cannot show prejudice. (See *Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 224–226 [rejecting claim that administrative hearing was unfair where the alleged error was harmless]; *UCSD*, *supra*, 5 Cal.App.5th at p. 1086 [rejecting claim of error in an administrative hearing where the petitioner did not show prejudice].)

### c.    *Policies on Administrative Appeal*

John also argues he was denied a fair process because the review committee did not follow its own written policies. John submitted at least 83 questions to be asked of Jane at the appeal hearing. On appeal, he claims the questions were "probative" and "designed to test her credibility, the veracity of the evidence, and the reasonableness of" Quillen's findings. The review committee asked only one of the proposed questions because it found the remaining questions "relate[d] to the underlying evidence and facts of the case." The chair of the review committee explained to John, "These questions might be appropriate if we were hearing the case for the first time; however, under Ground Two [unreasonable decision based on the evidence], our

24

purpose today is not to rehear the case, but to consider whether the analysis by the Title IX investigator was reasonable, give the evidence in the Title IX report."

As we have described, John appealed on three grounds: (1) procedural error, (2) unreasonable decision under the evidence, and (3) disproportionate discipline. The review committee chair was correct. The appeal hearing was an opportunity for John to show there was prejudicial error in the investigation or decision making, but it was not a second chance to develop evidence on the underlying allegations.

John relies on this rule from the UCSB Procedures: "The [review committee] shall take into account the record developed by the investigator and the evidence presented at the hearing, and may make its own findings and credibility determinations based on all of the evidence before it." From this language, John argues that the review committee was "clearly meant to perform an independent review of the [disciplinary] decision based on all the available evidence" and that the committee failed to perform such an independent review.

Nothing in the quoted language suggests the review committee was required to develop new evidence regarding the underlying allegations. As respondent points out, the rule cited requires the review committee to consider the record developed by the investigator ("shall"), but the committee is given discretion ("may") on whether to make its own findings and credibility determinations. The committee's refusal to ask John's proposed questions to Jane that addressed the underlying allegations was not a violation of its own rule. John's claim that the review committee failed to follow its own written policies, therefore, fails.

C.    *Substantial Evidence*

Finally, John argues no substantial evidence supports the finding of bodily injury.  He argues "the evidence directly contradicts" any inference of bodily injury.  The "evidence" he seems to be referring to is the lack of documentary evidence such as a medical report or photographs of an injury. But we have explained above that John's written statement alone provided sufficient evidence to establish he engaged in dating violence, including that his conduct caused bodily injury.  Moreover, Jane said she had a bump on the head.  This argument fails.  No more need be said.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Kline, P.J.


_____
Richman, J.


A159023, *Doe v. The Regents of University of California*

Filed 10/19/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN DOE,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE<br>UNIVERSITY OF CALIFORNIA,<br><br>     Defendant and Respondent. | A159023<br><br>(Alameda County<br>Super. Ct. No. HG18897877) |

BY THE COURT:

The opinion in the above-entitled matter filed on September 30, 2021, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

                                                        Kline, P.J.

Court:  Alameda County Superior Court

Trial Judge:  Hon. Jeffrey Brand

Hathaway Parker Inc., Mark M. Hathaway, Jenna E. Parker, for Plaintiff and Appellant

Nye, Stirling, Hale & Miller, LLP, Jonathan D. Miller, Holly C. Blackwell, for Defendant and Respondent

A159023, *Doe v. The Regents of the University of California*