Filed 5/8/23 Doe v. White CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION THREE

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TIMOTHY P. WHITE et al.,<br><br>    Defendants and Respondents. | B314030<br><br>Los Angeles County<br>Super. Ct. No.<br>20STCP02944 |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge. Affirmed.

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

California State University Office of General Counsel, Susan Westover and William C. Hsu for Defendants and Respondents.

———————————

# INTRODUCTION

John Doe and Jane Roe[1] met during their freshman year at California Polytechnic State University, San Luis Obispo (Cal Poly). They soon began a sexually active relationship, which lasted for several months. After they ended their relationship, Jane accused John of sexual misconduct and dating violence. After Cal Poly investigated Jane's accusations, the school held a hearing at which John and Jane appeared, testified, and posed questions to each other, which were asked by the hearing officer. The hearing officer found John committed three of the nine alleged acts of misconduct and recommended, among other things, that the school suspend John for one academic year. The school adopted the hearing officer's findings and recommended sanction. Following an unsuccessful administrative appeal, John petitioned the trial court for an administrative writ of mandate seeking to overturn Cal Poly's decision, which the court denied.

John appeals, arguing he did not receive a fair disciplinary hearing and that substantial evidence does not support the hearing officer's findings of misconduct or Cal Poly's sanction decision. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.  Cal Poly's Sexual Misconduct Policies

The California State University (Cal State) system has adopted a series of executive orders establishing the policies and

---

[1] For privacy purposes, we use the names "John Doe" and "Jane Roe" to refer to the parties involved in the underlying disciplinary proceedings. We hereafter refer to them as "John" and "Jane."

procedures that schools in the system, such as Cal Poly, must employ to investigate and adjudicate allegations of sexual misconduct. In 2016, Cal State adopted Executive Order 1097 (2016 Executive Order), which includes substantive policy provisions that prohibit dating violence and sexual misconduct of any kind. That order includes the following definitions that are relevant here.

Sexual misconduct includes "[e]ngaging in any sexual activity without first obtaining Affirmative Consent to the specific activity." Affirmative consent is defined as "an informed, affirmative, conscious, voluntary, and mutual agreement to engage in sexual activity." Silence does not constitute affirmative consent. Nor does affirmative consent exist when the accused student "knew or reasonably should have known that the [other] person was unable to consent to the sexual activity" because the other person was "asleep or unconscious" or was "incapacitated due to the influence of drugs, alcohol or medication, so that the [other] person could not understand the fact, nature or extent of the sexual activity." And the other person's consent to sexual activity on one occasion does not constitute consent on another occasion.

Dating violence is defined as "abuse committed by a person who is or has been in a social or dating relationship of a romantic or intimate nature with the victim." Abuse means "intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable apprehension of imminent serious bodily injury to self or another."

In 2019, Cal State revised Executive Order 1097 (2019 Executive Order). Under the 2019 Executive Order, a complaint of sexual misconduct or dating violence is investigated and

adjudicated under the revised order's procedures, while the substantive question of whether a student engaged in dating violence or sexual misconduct is determined under the policies and definitions in effect at the time the incidents occurred.[2]

If a school official receives a complaint of sexual misconduct, the school must conduct an investigation, which could culminate in a hearing. If a hearing is held, the hearing officer must determine whether the accused student violated Cal State's policies under a preponderance of the evidence standard of proof. At the hearing, each party is allowed no more than 10 minutes for an opening statement, and neither party is allowed to make closing statements.

If the hearing officer finds the accused student committed misconduct, she proposes a sanction, which is forwarded to the school's president, who may adopt the proposed sanction, adopt a different sanction, or altogether reject a sanction. The president's decision is forwarded to the parties, who have a right to appeal that decision to the Cal State's Chancellor's Office.

## 2.     Jane and John's Relationship

Jane and John met in early October 2017, while they were freshmen at Cal Poly. On October 7, they went to the beach before returning to John's room, where they kissed and, eventually, had sex. After that night, Jane and John began seeing each other regularly. They often had sex, and Jane would frequently sleep in John's room.

---

[2] Because all the alleged incidents of misconduct in this case occurred in 2017 and 2018, the 2016 Executive Order's substantive policies apply to John's disciplinary proceedings.

In late December 2017, John sent Jane a text message, telling her that he didn't want to be in a serious relationship. Jane initially was upset, but she reached out to John a few days later, telling him that she was open to trying to be friends.

On January 12, 2018, John invited Jane to a party hosted by the fraternity he was pledging. Jane and her roommate, McKenzie Harrison, attended the party together, before which they drank several shots of vodka. Jane and John talked at the party before returning to John's room, where they had sex. Jane slept in John's room several nights the following week.

On January 20, 2018, John took Jane to the Install Formal, a dance sponsored by his fraternity. Harrison also attended the dance with another student. While Jane and Harrison got ready in their room, they drank several shots of vodka. They then went to John's room, where they each had several more shots. In all, Jane had five or six shots of vodka before she and John went to the dance. She didn't drink any more alcohol that night.

After the dance, Jane and John returned to John's room, where they had sex before falling asleep. Later that night, Jane woke up to John trying to penetrate her vagina with his penis. Jane was lying on her side, and John was behind her. Once John penetrated Jane's vagina, he turned Jane onto her stomach so she couldn't move. Jane was confused about what was happening because she still felt drunk and had just been in a deep sleep. When Jane asked, "wait, what are you doing?", John replied, "I'm still turned on, … I want to have sex with you again." Jane told John that she didn't want to have sex, but he ignored her and continued to penetrate her. Jane remained silent until John finished because she was "confused" and "frozen." Jane left in the morning, but she sent John a text message that evening asking if she could take a nap in his room the next day after one of her final exams.

On February 3, 2018, John and Jane went to a party together. They had sex twice at the party. John became angry and started yelling at Jane while they were having sex the second time, after he noticed she was menstruating.

On April 7, 2018, Jane and Harrison attended a fraternity party, where they ran into John. John gave Jane several drinks before they returned to his room. There, they had rough but consensual sex.

On May 10, 2018, Jane attended another fraternity party with Harrison. Jane drank several shots of vodka before the party, and she had several more drinks at the party after running into John. Jane hung out with John before they both returned to his room, where they had rough but consensual sex.

On June 8, 2018, Jane and Harrison attended a Miami Vice themed party hosted by John's fraternity. Before the party, Jane and Harrison had a couple of shots of vodka. At the party, Jane had two or three cups of "jungle juice," a mixture of juice and hard alcohol. Jane and John danced and kissed at the party.

After returning to John's room, Jane and John had consensual sex before falling asleep. Jane later woke up on her stomach, with John on top of her trying to penetrate her vagina with his penis. John was using one of his hands to pin down Jane's neck while he used his other arm to spread open her legs. Jane told John several times that she didn't want to have sex, to which he responded, "be quiet, you're gonna wake [my roommates]." John then pushed Jane's face into the pillow to prevent her from talking, causing her to suffer a black eye where his hand pressed against her face. John continued to penetrate Jane while pinning down her head. Jane was terrified and left the room shortly after John stopped having sex with her.

### 3. Jane's Complaint and Cal Poly's Investigation

In February 2019, Jane filed a complaint with Cal Poly's police department, alleging John forced her to have nonconsensual sex on numerous occasions between October 7, 2017 and June 8, 2018. The police department forwarded Jane's complaint to Cal Poly's Office of Equal Opportunity (OEO).

In April 2019, Cal Poly began investigating Jane's allegations against John. One of Cal Poly's investigators interviewed Jane, John, Harrison, and two students who were John's roommates during his freshman year. Before his interview, John retained counsel, who provided the investigator with over 200 pages of text messages that John and Jane sent each other between October 2017 and February 2019.

On June 11, 2019, the investigator sent Jane and John a preliminary investigation report detailing Jane's allegations of sexual misconduct and dating violence as well as the evidence that the investigator had gathered. The report identified nine charges of misconduct against John, including allegations that he engaged in dating violence with Jane throughout their relationship and had nonconsensual sex with her on January 20 and June 8, 2018. Jane and John were informed that they could meet with the investigator to discuss the allegations and the report, respond to the evidence discussed in the report, and to present additional evidence. Both parties met with the investigator.

Between July and August 2019, the investigator issued two more preliminary investigative reports, which were sent to the parties. After each report was issued, Jane and John were allowed to meet with the investigator, present additional evidence, and dispute the evidence discussed in each report.

In October 2019, the investigator issued a final investigation report detailing the gathered evidence and identifying the material disputed facts. Jane and John received copies of the final report.

### 4. The Disciplinary Hearing

Following two continuances—one requested by each party—Cal Poly held a three-day remote hearing on Jane's complaint in May 2020. A neutral hearing officer presided over the hearing. Before questioning any witnesses, the hearing officer informed the parties that the hearing would be conducted under the procedures set forth in the 2019 Executive Order. John acknowledged that he was familiar with that executive order. The hearing officer also explained that she would evaluate the evidence presented at the hearing under the preponderance of the evidence standard—i.e., whether it was more likely than not that John violated Cal Poly's policies.

The attorney who represented John during Cal Poly's investigation served as John's advisor at the hearing. Before the hearing, John submitted about 70 questions for the hearing officer to ask Jane and the other witnesses. John did not call any witnesses on his behalf, but he proposed additional questions for the hearing officer to ask throughout the hearing.

The hearing officer gave John and Jane each 10 minutes to make an opening statement. John used about three of his allotted minutes. The hearing officer did not allow either party to make closing statements.

Jane, John, Harrison, and several other Cal Poly students testified at the hearing. The hearing officer allowed Jane and John each to testify uninterrupted about their version of events before asking her own questions. When the hearing officer asked

8

John whether he recalled waking Jane up in the middle of the night to have sex on January 20, 2018, he responded, "Never. Never. I would never do that." When asked about the June 8, 2018 incident, John provided a similar response: "At no point did I ever have sex with [Jane] in the middle of the night at all, at any time."

The hearing officer asked most of John's proposed questions for Jane, excluding only those the hearing officer believed had been asked and answered or were irrelevant, argumentative, or harassing. John did not object to the hearing officer omitting any of his proposed questions.

## 5.     The Decision and Sanction

On June 12, 2020, the hearing officer issued a 52-page statement of decision. The hearing officer found three of Jane's nine allegations were substantiated. Specifically, the hearing officer found it was more likely than not that John had nonconsensual vaginal intercourse with Jane on January 20 and June 8, 2018 and that he committed dating violence by recklessly causing Jane to suffer a black eye during the June 8 incident. Although the hearing officer noted that Jane's testimony was "sometimes inconsistent and more expansive than what she reported previously," she found John's "blanket statement of 'never' waking [Jane] in the middle of the night to engage in sex lack[ed] credibility." Specifically, John's "emphatic 'never' rang less than true, particularly when the Hearing Officer considered all statements made during the three days of testimony regarding the parties' nine-month relationship."

On June 24, 2021, the hearing officer recommended that Cal Poly issue the following sanction against John: (1) a one-year academic suspension; (2) mandatory participation in a "Men and

Masculinity Program"; (3) a mandatory assessment by a licensed mental health professional specializing in alcohol and drug use and completion of any recommended treatment program; and (4) compliance with a strict no contact order between John and Jane. In issuing her recommendation, the hearing officer noted that John never accepted responsibility, or showed any remorse, for his conduct.

Cal Poly adopted the hearing officer's recommended sanction and suspended John from school for one year. John filed an appeal with the Cal State Chancellor's Office, which was denied.

John filed a petition for writ of mandate against Timothy P. White, in his capacity as Cal State's Chancellor, and the Cal State Trustees, seeking an order requiring Cal Poly to set aside its decision, including the hearing officer's findings and the sanctions issued against John. The court denied John's petition and entered judgment in respondents' favor.

John appeals.

## DISCUSSION

### 1. Standard of Review

In an appeal from a judgment denying a petition for writ of mandate, we apply the same standards of review as the trial court. (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1072 (*Regents*).) We determine "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) The respondent abuses its discretion if it has not proceeded in the manner required by law, its decision is not supported by

10

the findings, or its findings are not supported by the evidence. (*Ibid*.) We independently review whether the administrative proceedings were fair. (*Regents*, at p. 1073.)

**2.     John received a fair hearing.**

John contends Cal Poly denied him a fair hearing because (1) he was unable to effectively cross-examine witnesses and present a defense; (2) the hearing officer improperly shifted the burden of proof; (3) the hearing officer was biased and acted as an advocate for Jane; and (4) he was prejudiced by unnecessary delay. As we explain, each of these arguments lacks merit.

**2.1.   Applicable Law**

Universities investigating and adjudicating student sexual misconduct are not required to employ the same procedures and safeguards used in criminal proceedings. (*Regents, supra*, 5 Cal.App.5th at p. 1078.) Still, universities must provide an accused student notice of the allegations and a fair hearing at which he has an opportunity to rebut those allegations. (*Id.* at p. 1077.)

While no particular form of hearing is required under California law, courts have delineated a series of minimum procedures universities must employ in student disciplinary hearings. (*Regents, supra*, 5 Cal.App.5th at p. 1078; *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 634–635 (*Westmont*).) A university must follow its own policies and procedures. (*Regents*, at p. 1078.) Those procedures must afford the accused student a hearing before a neutral adjudicator. (*Westmont*, at p. 635.) The accused student must have the opportunity to respond to charges and evidence against him, and

11

the university must provide him with the names of witnesses and the facts to which each witness testifies. (*Ibid*.)

When resolution of the charges against the accused student turns on the credibility of witnesses, the complaining student and other important witnesses must appear before the adjudicator— either in person, by video conference, or by some other means—to allow the adjudicator to observe their demeanor. (*Westmont, supra*, 34 Cal.App.5th at pp. 635, 638–639.) The complainant and the accused student do not need to appear in the same room for the hearing, however. (*Ibid*.) Additionally, while there is no requirement that the accused student be able to directly cross-examine the complainant and other witnesses, the accused student must be given the opportunity to pose questions to the complainant and other witnesses. (*Regents, supra*, 5 Cal.App.5th at pp. 1084–1085.) The questions may be asked indirectly, such as through pre-written questions read by the adjudicator. (*Westmont*, at p. 635.) The adjudicator has discretion to omit questions that are irrelevant, inflammatory, or call for answers that are cumulative of other evidence already considered. (*Doe v. Occidental College* (2019) 40 Cal.App.5th 208, 228 (*Occidental*).)

## 2.2.  John was not denied the right to cross-examine witnesses.

John argues he was denied the right to cross-examine witnesses at his disciplinary hearing because he was unable "to directly cross-examine [Jane] and other witnesses." This argument lacks merit.

As we just explained, an accused student does not have the right to directly cross-examine the complainant and other witnesses during a disciplinary hearing. (*Westmont, supra*, 34 Cal.App.5th at p. 638.) All that is required is that the accused

12

student be given the chance to pose questions to the complainant and other witnesses, questions which may be asked indirectly—i.e., by the adjudicator. (*Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1066 (*Allee*).)

That is exactly what happened here. The hearing officer gave John several opportunities to pose questions to Jane and the other witnesses. The hearing officer allowed John to submit questions before Jane testified, most of which the hearing officer asked. The hearing officer also offered John the opportunity to submit follow-up questions in response to Jane's testimony. John, therefore, wasn't denied the opportunity to cross-examine witnesses at his disciplinary hearing.

### 2.3. John was not denied his right to present a defense.

Next, John contends he was denied the opportunity to present a full defense at his disciplinary hearing. Specifically, John argues the hearing officer improperly cut short his opening statement, denied him the opportunity to "present a defense case or redirect or clarify his own testimony," and did not allow him to respond to evidence. This argument also lacks merit.

Per the 2019 Executive Order, the hearing officer gave John and Jane each 10 minutes to present an opening statement. According to the hearing officer, John only used about 3 of his allotted 10 minutes. Nothing in the record suggests the hearing officer cut short John's opening statement.

John also was provided ample opportunities to present a defense. During the investigatory phase, John was allowed to respond to all of Jane's allegations, including providing the investigator with his version of the events that occurred during his relationship with Jane. John gave the investigator the

evidence he believed supported his side of the story, including the text messages he and Jane exchanged throughout their relationship. John also was given the opportunity to review the investigator's reports, correct any of his statements in those reports, and respond to evidence discussed in those reports.

At the disciplinary hearing, the hearing officer allowed John to testify about his version of events without interruption before she began questioning him. John proposed numerous questions that the hearing officer asked Jane and the other witnesses. And, before concluding the hearing, the hearing officer gave John the chance to pose additional questions, respond to Jane's testimony, and to testify about any facts that had yet to be addressed. Although the hearing officer did not allow John to give a closing argument, she did not allow Jane to give one either. Indeed, the 2019 Executive Order prohibits the parties from given closing arguments at disciplinary hearings. John does not cite to any authority requiring universities to afford accused students the opportunity to give closing arguments at a disciplinary hearing.

In short, the record does not support John's claim that he was denied the right to present a defense at his disciplinary hearing.

### 2.4. The hearing officer did not misapply the standard of proof.

John also contends the hearing officer misapplied the preponderance of the evidence standard of proof at the disciplinary hearing. We disagree.

John does not point to anything in the record suggesting the hearing officer failed to apply the preponderance of the evidence standard of proof. Indeed, the hearing officer repeatedly

14

acknowledged the preponderance of the evidence standard throughout John's disciplinary proceedings. For instance, at the beginning of the hearing, she explained that she would apply the standard to each of the charges against John. And, when explaining her findings as to each charge, including the charges she sustained, the hearing officer explained that she "examined the evidence, assessed the credibility of the parties and the witnesses, and weighed the evidence under a preponderance of the evidence standard."

John insists, however, that the hearing officer shifted the burden of proof, requiring him to present evidence that would establish it was more likely than not that he obtained Jane's affirmative consent before engaging in the charged sexual acts on January 20 and June 8, 2018 and that he did not engage in dating violence during the June 8 incident. Specifically, John argues the hearing officer's findings that "[t]here is no evidence that the vaginal penetration was voluntary and mutual" shows the hearing officer placed the burden of proof on John to show he obtained Jane's consent before having sex with her. The record doesn't support this claim.

Jane repeatedly testified that she never consented to having sex with John during the January 20 and June 8, 2018 incidents because she either: (1) told John she didn't want to have sex; (2) was too intoxicated to consent to having sex with John; or (3) was too confused to consent to sex because she was coming out of a deep sleep when John penetrated her. Cal Poly, therefore, presented affirmative evidence that would support a finding that John did not obtain Jane's consent before having sex with her. And the hearing officer relied on this evidence in her statement of decision when she sustained the sexual misconduct

15

charges arising out of the January 20 and June 8, 2018 incidents. The hearing officer's observation that there was no evidence showing the parties engaged in voluntary and mutual sex during those incidents merely reflects the hearing officer's view that John failed to successfully rebut Cal Poly's evidence; it does not suggest the hearing officer improperly shifted the burden of proof.

### 2.5. John has not shown the hearing officer was biased.

John next contends the hearing officer was biased and acted as an advocate for Jane because the hearing officer: (1) ignored the fact that Jane "filed a false police report regarding January 12, 2018 and May 19, 2018"; (2) failed to ask Jane whether she asked John if she could nap in his residence the day after the January 20, 2018 incident; (3) failed to follow up on Jane's April 14, 2018 text message telling John she wanted to spend more time with him; (4) improperly modified some of John's proposed questions; (5) attempted to rehabilitate Jane's and Harrison's testimony about the January 20, 2018 incident; (6) allowed the investigator to identify any material differences between the parties' testimony and the statements they made during the investigation; and (7) allowed officials from Cal Poly's Office of Equal Opportunity to "tell her how to sanction" John. These arguments are not well-taken.

As a preliminary matter, John never argued at any point below that the hearing officer was biased. He didn't raise the issue at the disciplinary hearing, in his administrative appeal, or in the trial court. John has therefore forfeited any claim of hearing officer bias by failing to raise that issue until this appeal. (*Occidental, supra*, 40 Cal.App.5th at p. 225.)

16

Nor did John object to many of the specific instances he claims evidence the hearing officer's bias. For instance, he did not object when the hearing officer omitted any of his questions that weren't asked. Nor did he object to the hearing officer modifying any of his questions. He has, therefore, forfeited any claim of bias or error based on the hearing officer's decision to omit or modify any of his proposed questions (*Occidental, supra,* 40 Cal.App.5th at p. 225.)

In any event, John hasn't shown any error or bias stemming from the hearing officer's decision to omit some of his questions. The hearing officer stated that she considered "[a]ll documentary exhibits," which includes the more than 200 pages of text messages that John gave to the investigator, including Jane's January 21, 2018 text asking John if she could sleep in his room. Thus, any response to John's proposed question about whether Jane sent that text message would have been cumulative of the message itself.

As for John's claim that the hearing officer failed to follow up on Jane's April 14, 2018 text message, the hearing officer *did* ask Jane about that message. Specifically, the hearing officer asked Jane, "on April 14, 2018, one week after you alleged John sexually assaulted you, did you tell him that you wanted to spend time with him and to cuddle with him?" When Jane confirmed she sent that message, the hearing officer followed up, asking Jane what she meant by "cuddles," to which Jane replied that she couldn't remember.

John also never objected on the grounds that the hearing officer improperly rehabilitated Jane's or Harrison's testimony. For example, he didn't object when the hearing officer followed up on parts of Jane's testimony, such as when the hearing officer

17

sought clarification as to whether Jane meant she was too incapacitated to provide consent when Jane testified that although she consented the first time she had sex with John on January 20, 2018, she "was drunk" at the time. By failing to object, John has forfeited any claim of bias or error arising out of the hearing officer's efforts to clarify witness testimony. (*Occidental*, *supra*, 40 Cal.App.5th at p. 225.)

Moreover, John didn't object when the hearing officer allowed the investigator to identify evidence presented at the hearing that the investigator believed was materially different from the evidence gathered during the investigation. Nor does John point to any authority prohibiting a hearing officer from eliciting such testimony during a disciplinary hearing. John has therefore forfeited any claim of bias or error based on such conduct. (*Occidental*, *supra*, 40 Cal.App.5th at p. 225.)

John also hasn't shown the hearing officer erred or was otherwise biased because she "ignored that Jane … filed a false police report regarding January 12, 2018 and May 19, 2018." First, John points to nothing in the record establishing or suggesting Jane filed a false police report. While the hearing officer found Jane's allegations arising out of the incidents that occurred on January 12 and May 19 were unsubstantiated, that does not mean the allegations were false. Second, John fails to explain how the hearing officer's refusal to acknowledge falsities in Jane's police report establishes the hearing officer was biased. (See *Allee*, *supra*, 30 Cal.App.5th at p. 1060 ["A disciplinary decision may not be invalidated solely on the basis of an inference or appearance of bias."]; *Doe v. Occidental College* (2019) 37 Cal.App.5th 1003, 1018 [" 'A party seeking to show bias or

prejudice on the part of an administrative decision maker is required to prove the same "with concrete facts[.]" ' "].)

Finally, John forfeited any claim that the hearing officer was somehow biased because she relied on a third-party's sanction recommendation because he did not raise that issue in his administrative appeal or in the trial court. (*Occidental, supra,* 40 Cal.App.5th at p. 225.) In any event, John fails to explain how the hearing officer's reliance on a third-party's sanction recommendation evidences any bias or prejudiced him in any manner. (See Cal. Const., art. VI, § 13 [no reversal if error did not result in miscarriage of justice]; Code Civ. Proc., § 475 [no judgment shall be reversed by reason of any error unless the error was prejudicial and a different result would have been more probable without such error].)

In sum, John has failed to show the hearing officer harbored any bias against him.

### 2.6. John has not shown he was prejudiced by any delay.

John argues Cal Poly unnecessarily delayed completing its investigation of Jane's allegations and in conducting his disciplinary hearing. These arguments are meritless.

Under the 2019 Executive Order, a university has 120 working days from the date a Notice of Investigation is sent to the parties to complete its investigation. As John acknowledges, the investigator completed her investigation 108 days after Cal Poly sent the parties a Notice of Investigation. Cal Poly, therefore, did not delay in completing its investigation. In any event, John does not explain how he suffered any prejudice as a result of the investigation taking 108 days to complete.

19

Nor has John shown he was prejudiced because Cal Poly did not conduct his disciplinary hearing until more than a year after Jane filed her complaint of sexual misconduct. Although the hearing officer noted that some of the witnesses' recollections of events and specific details "may have been affected by the passage of time," John does not point to anything in the record showing any delay affected the hearing officer's findings that he engaged in sexual misconduct on January 20, 2018 and sexual misconduct and dating violence on June 8, 2018. For instance, John doesn't claim he was unable to adequately defend against those charges because the passage of time affected his ability to recall what happened on January 20 or June 8, 2018. Indeed, as Cal Poly points out, John repeatedly and adamantly denied that he ever woke Jane up in the middle of the night to have sex with her.

### 3. Substantial evidence supports the hearing officer's findings.

Next, John contends the hearing officer's findings that some of Jane's testimony was credible and that John engaged in two acts of sexual misconduct and one act of dating violence are not supported by the evidence. We are not persuaded.

We review the university's substantive decision for substantial evidence. (*Doe v. Claremont McKenna College* (2018) 25 Cal.App.5th 1055, 1065.) We do not weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence. (*Regents*, *supra*, 5 Cal.App.5th at p. 1073.) The university's findings come before us with a " 'strong presumption as to their correctness and regularity.' " (*Ibid*.) Thus, if the university's decision is reasonable, we will not substitute that decision with our own judgment. (*Ibid*.) We will only set aside the

20

university's findings if " 'no reasonable person could reach the [same] conclusion.' " (*Ibid*.)

We must accept all the evidence that supports the prevailing party, disregard all contrary evidence, and draw all reasonable inferences necessary to uphold the university's findings. (*Regents, supra,* 5 Cal.App.5th at p. 1074.) Witness credibility is an issue of fact for the fact finder, and "the testimony of a single witness, even that of a party, is sufficient to provide substantial evidence to support a finding of fact." (*Ibid*.)

The hearing officer found John engaged in sexual misconduct on January 20, 2018 and sexual misconduct and dating violence on June 8, 2018. Substantial evidence supports these findings.

As to the January 20, 2018 incident, Jane testified that she and John went to his room after they attended a dance hosted by his fraternity. Jane was still drunk when they got there. Although they had consensual sex before falling asleep, Jane woke up during the early morning hours to John penetrating her vagina with his penis. Jane was confused about what was happening because she had been in a deep sleep and still felt drunk. Once she realized that John was having sex with her, she said, "wait, what are you doing?" When John replied that he was "still turned on," Jane told him that she wasn't in the mood for sex. John continued to have sex with Jane despite her protest. From that point on, Jane remained silent because she was "confused and frozen." This evidence amply supports a finding that, at the very least, John did not obtain Jane's affirmative consent before having sex with her.

Substantial evidence also supports the hearing officer's finding that John engaged in sexual misconduct on June 8, 2018.

21

After John and Jane attended a Miami Vice themed party, they returned to his room, where they had consensual sex before falling asleep. Jane later woke up on her stomach, with John on top of her, penetrating her vagina with his penis. According to Jane, John was pinning down her neck with one of his arms while he used his other arm to spread open her legs. Jane told John several times that she didn't want to have sex, but he didn't stop penetrating her. Instead, he told her to "be quiet" because she would wake his roommates. John then pushed Jane's face into a pillow to keep her from making noise while he continued to penetrate her. This evidence also clearly supports a finding that John had sex with Jane without her consent.

And finally, substantial evidence supports the hearing officer's finding that John engaged in dating violence during the June 8, 2018 incident. Jane testified that she suffered a black eye as a result of John using his hand to push her face into a pillow while he forced her to have sex with him.

John argues the hearing officer erred in relying on Jane's testimony. According to John, Jane's testimony was not believable in light of (1) the numerous text messages she sent him throughout their relationship expressing satisfaction with some of their sexual activities and her desire to make their relationship more serious; (2) Jane's confusion about when some of the alleged instances of misconduct and dating violence occurred; and (3) Jane's testimony that contradicted some of the statements she made during the pre-hearing investigation. To support his argument, John points out that the hearing officer noted in her statement of decision that while Jane's "answers to questions at the hearing were specific and detailed, they were sometimes inconsistent and more expansive than what she

reported previously." John contends that because the hearing officer found some of Jane's statements lacked credibility, the hearing officer should have discredited all of Jane's testimony. This argument lacks merit.

It is well-settled that appellate courts will not second guess the trier of fact's credibility determinations. (*Regents*, *supra*, 5 Cal.App.5th at p. 1077 ["credibility is for the fact finder to determine"].) The hearing officer in this case observed Jane and John testify and compared the parties' testimony to their statements during the pre-hearing investigation. Thus, the hearing officer was in the best position to evaluate the witnesses' credibility, including the credibility of Jane's testimony. That the hearing officer discredited parts of Jane's testimony does not mean she was required to discredit all of Jane's testimony. Fact finders commonly find some aspects of a witness's testimony credible while disregarding other parts of that testimony.

4. **Substantial evidence supports Cal Poly's sanction decision.**

Finally, John challenges Cal Poly's decision to suspend him for one academic year and require him to complete a drug and alcohol assessment. We review a university's decision to discipline a student for engaging in sexual misconduct and dating violence for abuse of discretion. (*Regents*, *supra*, 5 Cal.App.5th at p. 1106.) We do not substitute our discretion for that of the university. (*Ibid*.) " 'It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown.' " (*Ibid*.)

As we just explained, substantial evidence supports the hearing officer's findings that John had sex with Jane without her consent on two occasions and gave her a black eye during one

23

of those occasions while trying to ensure she wouldn't alert other people in the room that he was having sex with her. Due to the serious nature of each of those acts of misconduct, as well as John's refusal to accept responsibility or show remorse for any of his conduct, Cal Poly was well within its discretion to suspend John for one year.

Cal Poly also acted within its discretion when it required John to complete a drug and alcohol program. John was only a teenager during the events leading to this case. He admitted throughout the hearing that he and Jane frequently consumed alcohol before they had sex, including leading up to the incidents on January 20 and June 8, 2018. It was, therefore, more than reasonable for the school to conclude that John had issues with alcohol use and that alcohol was a contributing factor when he had sex with Jane without her consent and gave her a black eye.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.