Filed 8/8/24

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re Zoe H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.H., Defendant and Appellant. | E082653 (Super.Ct.Nos. J297666, J297667, J297668) OPINION |

APPEAL from the Superior Court of San Bernardino County. Lynn M. Poncin, Judge. Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel and Dawn Martin, Deputy County Counsel, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.B and II of the Discussion.

1

E.H. (mother) challenges the sufficiency of the evidence supporting the juvenile court's dispositional order removing her three minor children from her care under subdivision (c)(1) of section 361 of the Welfare and Institutions Code (§ 361(c)(1)). (Unlabeled statutory references are to this code.) We affirm.

We partially publish this opinion because of a mistake that continues to be made in briefing and opinions in appeals from disposition in dependency cases. In this case, San Bernardino County Children and Family Services (CFS) argues that "'[t]he jurisdictional findings are prima facie evidence the child cannot safely remain in the home.'" That is incorrect. By statute, a jurisdictional finding "pursuant to subdivision (e) of Section 300" (§ 300(e))—that is, a finding of severe physical abuse of a child less than five years old— constitutes prima facie evidence that the child cannot safely remain in the home. (§ 361(c)(1).) Jurisdictional findings under the other subdivisions of section 300 do *not* constitute prima facie evidence that the child cannot safely remain in the home. (*In re E.E.* (2020) 49 Cal.App.5th 195, 218-219 (*E.E.*); *In re M.V.* (2022) 78 Cal.App.5th 944, 958 (*M.V.*).)

The erroneous proposition on which CFS relies—that any jurisdictional finding under any subdivision of section 300 constitutes prima facie evidence for removal from parental custody—has been repeated in nine published opinions (and hundreds of unpublished opinions). (See *In re D.B.* (2018) 26 Cal.App.5th 320, 332 (*D.B.*); *In re A.F.* (2016) 3 Cal.App.5th 283, 292 (*A.F.*); *In re J.S.* (2014) 228 Cal.App.4th 1483, 1492 (*J.S.*), disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989,

2

1010, fn. 7; *In re A.E.* (2014) 228 Cal.App.4th 820, 825 (*A.E.*); *In re T.V.* (2013) 217 Cal.App.4th 126, 135 (*T.V.*); *In re John M.* (2012) 212 Cal.App.4th 1117, 1126 (*John M.*); *In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*); *In re R.V.* (2012) 208 Cal.App.4th 837, 849 (*R.V.*); *In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*).) Two subsequent cases have pointed out the error. (*E.E.*, *supra*, 49 Cal.App.5th at pp. 218-219; *M.V.*, *supra*, 78 Cal.App.5th at p. 958.) But as the briefing in this case illustrates (and recent unpublished opinions confirm), old habits die hard.

As we explained in *E.E.*, this mistake has "real consequences." (*E.E.*, *supra*, 49 Cal.App.5th at p. 219.) It effectively deprives parents "'of appellate review of removal if there was a sufficient evidentiary basis for jurisdiction.'" (*Ibid.*)

We accordingly partially publish this opinion to emphasize the point once more: It is not true that jurisdictional findings in general constitute prima facie evidence that the child cannot safely remain in the home. Rather, only a jurisdictional finding of severe physical abuse of a child under age five pursuant to section 300(e) constitutes prima facie evidence that the child cannot safely remain in the home.

BACKGROUND

I.    *Family background and dependency history*

Mother and J.I. (father) have three children—Zoe H. (born 2012), Zechariah I. (born 2018), and Zuri H. (born 2019). In 2023, the children lived with mother and her fiancé (not father) in California. Mother worked as a social worker for the Riverside County Department of Public Social Services (DPSS). Father lived in Texas.

3

In 2018, Zoe and Zechariah were removed from both parents in Texas because of domestic violence by father. Zoe and Zechariah were placed with the paternal grandmother for three months to one year (accounts varied). Mother was unsure whether "allegations against her were found to be untrue."

In 2020, DPSS received two referrals alleging general neglect and abuse by mother. In February, it was reported that mother hit Zechariah "really hard" with a shoe or a belt every morning. Mother reportedly yelled all of the time and was mean to Zoe, who appeared depressed. In March, DPSS received a referral alleging that Zoe cried uncontrollably because mother yelled at her while driving her to school. Mother reportedly called Zoe "evil" and told Zoe that she would allow DPSS to take her if she spoke with DPSS again. DPSS investigated both 2020 referrals and concluded that the allegations were unfounded.

II.    *Present investigation*

In May 2023, DPSS received a 10-day referral alleging general neglect and physical abuse of Zoe by mother. It was reported that Zoe was crying hysterically, wanted to kill herself, banged her head against a wall, and grabbed a pencil and pointed it toward her stomach. Zoe told someone that mother beat and hit her but did not hit her siblings. Zoe believed that mother hated her. Zoe did not have any visible marks or bruises.

A social worker interviewed Zoe at school the following week. Zoe denied that she expressed having suicidal thoughts, and she told the social worker that she had made

4

up everything because she was mad at mother.  Zoe also denied that she pointed a pencil towards her stomach or banged her head against the wall, even though the social worker told Zoe that someone witnessed the head-banging.  Zoe cried and pleaded with the social worker not to talk to mother.

In mid-June 2023, a social worker attempted to speak with mother on the phone.  Mother hung up on the social worker twice.  Mother eventually called the social worker, who informed mother that DPSS had an open investigation.  Mother refused to schedule an appointment with the social worker to meet with mother at mother's home.  Mother did not want the social worker to speak with the children and became angry upon learning that the social worker had already spoken with Zoe.

The social worker made an unannounced visit to mother's home that day.  No one answered the door.  Mother later called and spoke with the social worker on the phone.  She told the social worker that she would make the social worker's life a living hell.  Mother reported that Zoe was "an angry little girl" and a liar.  Mother denied that she hit the children.  Mother eventually agreed to allow the social worker to visit the home and speak with the children.

The social worker arrived at mother's home with two law enforcement officers about one hour later.  Mother answered the door and introduced Zechariah and Zuri to the social worker.  Mother invited the social worker into the home.  Before entering the home, the social worker informed mother that law enforcement was present.  Mother started yelling and accused the social worker of lying to her.  Zechariah started crying.  A

5

law enforcement officer asked mother to calm down because mother's screaming was scaring the children. Mother slammed the door. The social worker could hear mother screaming at Zoe inside the house. Mother told Zoe that she could leave with the social worker and yelled, "'You see what you did?'" Mother opened the door, and the social worker and an officer attempted to calm down mother but failed. Mother closed the door again, and the social worker rang the doorbell. Mother opened the door and threw out Zoe's belongings. Mother said, "'Go ahead take her.[] Since that's what she wants, take her I don't care.'" Mother then kicked Zoe out of the house. Zoe was crying and pleading to stay in the home.

The social worker told mother that she had just wanted to speak with mother about the allegations and did not want to remove the children from the home. Mother spoke with the social worker briefly, denied that she beat or hit Zoe, and refused to discuss the Texas dependency case. Mother slammed the door, and the social worker left with Zoe.

A social worker interviewed Zoe the next day. With respect to what happened the day before, Zoe explained that mother was upset that Zoe had spoken with a social worker. Zoe disclosed that mother's anger the previous night frightened her, but she explained that it was "'normal'" and that mother arrived "home angry most of the time and [Zoe] is used to her mother directing her anger towards Zoe." Zoe reported that mother disciplined her and Zuri by hitting them with a plastic hanger or a shoe. Mother did not hit Zechariah. Zoe believed that Zechariah was spared because he was mother's favorite child.

6

III.    *The allegations and the initial hearing*

In June 2023, DPSS filed a dependency petition with jurisdictional allegations under section 300 against mother as to all three children. With respect to all three children, the petition contained allegations against mother under subdivisions (b)(1) and (g) of section 300. The petition contained additional allegations against mother under subdivision (j) of section 300 with respect to Zuri and Zechariah and under subdivision (c) of section 300 as to Zoe. The petition also contained an allegation against father under subdivision (g) of section 300. (Father is not a party to this appeal.)

At the initial hearing, the juvenile court detained Zoe from mother but did not detain Zuri or Zechariah. The court authorized DPSS to return Zoe to mother if DPSS deemed the return appropriate. The court ordered supervised visits for mother with Zoe.

IV.    *Transfer to San Bernardino County*

At the initial hearing, the Riverside County juvenile court granted DPSS's request to transfer the case to San Bernardino County because of the conflict created by mother's employment with DPSS.

In late June 2023, the San Bernardino County juvenile court held a transfer-in hearing. Minors' counsel and county counsel expressed concern about Zuri and Zechariah remaining released to mother. The court continued the hearing for one week to allow CFS time to contact mother, to learn about the services previously ordered, and to assess mother's progress.

CFS filed an addendum report the following week. A social worker had interviewed mother and the children. Zoe told the social worker that several times per month mother hit Zoe on her back over her clothing. Mother hit her for no reason. Zoe believed that mother took out her anger on Zoe. Mother usually hit Zoe in Zoe's bedroom when her siblings were not present. Zoe reported that the other children did not see mother hit her. Zoe did not want to visit with mother.

The social worker interviewed Zechariah and Zuri in their home. The children appeared happy and healthy. The social worker interviewed each of them privately in their bedroom. Zechariah denied that mother physically disciplined any of the children, including Zoe. Zuri said that when she and Zechariah got in trouble, mother required them to "'sit out.'" But Zuri also said of Zoe, "'She gets hit.'" As soon as Zuri made that statement, Zechariah ran into the room and yelled, "'No Zuri, remember, we talked about it in the car. Zoe doesn't get hit.'" Zuri then told the social worker, "'Zoe doesn't get hit. She has to sit.'"

Mother denied that she physically disciplined any of the children. Mother reported that she took away Zoe's iPad to discipline her. According to mother, Zoe lied and had a history of making false allegations. Mother did not know why Zoe lied but explained, "'Zoe does stuff when she doesn't get her way. She breaks stuff and hits her siblings.'"

At the continued hearing, the San Bernardino County juvenile court accepted the transfer of the matter from Riverside County. Minors' counsel requested that Zuri and

8

Zechariah be detained from mother. Counsel had met with Zoe, believed that mother abused her, and argued that Zuri and Zechariah were at risk of abuse if they remained released to mother. Before the hearing, mother resisted allowing a social worker to speak with Zuri and Zechariah and only acquiesced when the social worker explained that she would report that mother was withholding access to the children. CFS did not comment on whether Zuri and Zechariah should be detained. The court expressed concern about mother's apparent coaching of Zuri and Zechariah before their interviews, but the court did not order Zuri and Zechariah detained.

The court set the jurisdiction and disposition hearing for the following week. The court ordered CFS to assess "whether or not the children should remain with the mother, what services have been in place and are in place for reasonable efforts to allow the children to remain out of placement and remain in the care of the mother." The court ordered supervised visits for mother with Zoe, as well as supervised sibling visitation that mother was not allowed to supervise.

V. *Jurisdiction and disposition*

For the jurisdiction and disposition report, the social worker interviewed mother, Zuri, and Zechariah at mother's home. Mother stated that she does not trust social workers, because "they lie in the reports." Mother denied using corporal punishment to discipline the children. She reported that she instead talked to the children and took away their tablets. Mother denied that she emotionally abused Zoe. She said that Zoe

9

responded angrily to being disciplined.  Zoe had behavioral issues and attempted to run away from school and from daycare.

Before the 2023 referral, Zoe had been participating in counseling at school and through a medical provider.  Mother also reported that she had been in counseling because of her history involving domestic violence, but she denied having any unresolved mental health issues.  Mother was willing to participate in services to have Zoe returned.

While the social worker spoke with mother, she observed Zechariah and Zuri playing and being "very rambunctious."  They fought over a toy, and Zechariah hurt Zuri.  Mother did not get angry with the children.  Mother redirected the children, but "they did not always listen to" her.  Zuri and Zechariah did not appear fearful of mother.

The social worker interviewed Zuri and Zechariah privately outside of the home.  They denied that mother physically abused them, and they reported feeling safe at home.  Zechariah said that mother disciplined him and Zoe by making them "'just sit[] down.'"  Zuri said that mother disciplined her by making her go to bed for five minutes.

CFS was worried about the children's safety but recommended that Zuri and Zechariah remain in the home with services.  CFS recommended that the court order Zoe removed from mother's custody.

The juvenile court conducted the contested jurisdiction and disposition hearings over the course of numerous days from July through November 2023.  At a hearing in July, minors' counsel indicated that he disagreed with CFS's recommendation and believed that all three children should be removed.

10

At a hearing in August 2023, minors' counsel called both mother and the author of the jurisdiction/disposition report to testify. Mother testified that she worked as a family maintenance social worker with DPSS. Mother denied being confrontational with the DPSS social worker who made the initial visit to her home and denied that she was upset about Zoe being interviewed at school before that visit. Mother was upset that the social worker showed up at her home with law enforcement, but mother denied that she yelled and explained that she "talk[s] very loudly." Mother admitted that she told the social worker to take Zoe but said that she placed Zoe's belongings outside and did not throw them.

Mother denied that she hit Zoe, took out her anger on Zoe, or hated Zoe. Mother denied that Zoe was in any trouble when the initial allegations were made. Mother said Zoe was lying about being hit, and she testified that "[k]ids are dishonest." Asked if her parenting played any role in Zoe's dishonesty, mother responded, "I don't think it has to do with a role. There's genes involved also." Mother clarified that dishonesty was in father's genes.

Mother did not believe that she was being treated fairly, and she believed that the DPSS social worker was biased against her because mother was a social worker. With respect to the Texas dependency proceeding, mother believed that the social worker did not do his job well.

On cross-examination, mother explained that she was enrolled in parenting classes, had already attended two sessions, but had not yet learned anything. Mother

11

believed that she needed help with Zoe and was willing to work on strengthening their relationship.

The social worker testified that there was some risk that mother would physically harm or emotionally abuse Zuri and Zechariah if they remained in mother's custody. The social worker explained that mother's behavior toward Zoe was consistent with a "family dynamic known as 'scapegoating,'" which occurs when a parent places "all the blame on one child." The social worker explained that in general when a scapegoat is removed there is a risk that another child could be scapegoated. Scapegoating behavior "tend[s] to pass down the line from [the] oldest down." The social worker opined that there was a "significant" risk with Zoe not living in the home that Zuri or Zechariah would "become the family scapegoat next."

Despite the risks of physical and emotional harm to Zuri and Zechariah, the social worker recommended that Zuri and Zechariah remain with mother with family maintenance services. Zuri and Zechariah did not appear fearful of mother during the social worker's visit, and mother was willing to address issues she had with controlling Zuri and Zechariah. The social worker believed Zoe's disclosures and believed that the allegation that mother hit the children with hangers and shoes should be sustained.

After hearing testimony and argument, the court set forth its intended ruling on jurisdiction and disposition, indicating that it intended to sustain allegations against mother involving all three children and to remove the children from her custody. CFS

12

then informed the court that father had not been properly noticed. The court accordingly continued the hearing to allow CFS time to give notice to father.

The court detained Zuri and Zechariah from mother, finding that they were at risk of harm if they remained in her custody.[1] The court expressed concern about mother scapegoating Zuri or Zechariah. The court also noted that mother had caused physical and emotional harm to Zoe despite participating in therapy before DPSS intervened. The court found it significant that mother had not taken any responsibility for her conduct that led to Zoe's removal. With respect to all three children, the court ordered supervised visits for mother.

In late August 2023, a social worker spoke with the paternal grandmother, who reported that father was incarcerated. The paternal grandmother did not believe the allegations that mother hit Zoe, remarking that "'Zoe tells stories.'" A social worker interviewed father in late September. Father had not seen the children for years and last spoke to them six months earlier. Father was upset that the children had been removed from mother and said that "Zoe stated she lied two days after it occurred." Father did not explain how or from whom he acquired that information.

---

[1] Although the court ordered the jurisdiction and disposition hearings continued, the court nevertheless indicated that it was ordering the children removed from mother's custody. Section 361(c)(1) did not authorize the court to remove Zuri and Zechariah from mother until after completion of the jurisdiction hearing. However, even though section 361(c)(1) did not authorize the removal while the jurisdiction and disposition proceedings were in-progress, the error is harmless. The juvenile court had authority to detain Zuri and Zechariah under subdivision (c)(1)(A) of section 319, which has a lower standard of proof than section 361(c)(1).

13

At a hearing in late September 2023, the court ordered increased visitation for mother, with visits to continue to be supervised and at minimum twice weekly and two hours.

In early October 2023, CFS filed amended petitions containing allegations against mother under subdivisions (b)(1) and (g) of section 300 as to all three children, an allegation under subdivision (c) of section 300 as to Zoe and Zechariah, and an allegation under subdivision (j) of section 300 as to Zuri and Zoe. The amended petition also contained allegations against father under subdivisions (b)(1) and (g) of section 300.[2] At a hearing in early October, mother's counsel objected to the continued detention of the children from mother and asked that they be released to her. The court denied the request but directed CFS to provide updates on mother's progress with services and on visitation.

---

**2** CFS filed a report indicating that the only difference in the allegations contained in the initial petition and the amended petition was that there were two new allegations added as to father under subdivision (b)(1) of section 300. That is not correct. The original petition contained allegations against mother under subdivision (j) of section 300 as to Zuri and Zechariah, but the amended petition contained allegations under that provision as to Zoe and Zuri and not Zechariah. The allegation of sibling abuse under section 300, subdivision (j), as to Zoe appears mistaken, as the allegation reads: "The children's sibling, Zoe . . . , comes within Welfare and Institutions Code 300 section (c); therefore these children are at risk of similar harm." Moreover, the amended petition contains an allegation of emotional abuse under subdivision (c) of section 300 as to Zechariah that was not contained in the original petition. The added allegation as to Zechariah appears mistaken too, as it does not refer to circumstances involving Zechariah. It reads: "The child is suffering serious emotional damage in that she disclosed wanting to kill herself due to the continued abuse by her mother. In addition, the mother continues to blame the child."

14

At a hearing in late October 2023, the court dismissed the allegations against the parents under subdivision (g) of section 300 but otherwise sustained the allegations in the amended petition against both parents. Mother's counsel requested a continuance of the dispositional hearing in order to allow CFS time to provide the previously ordered update on mother's progress, which CFS had not yet produced. The court granted the request and set the contested disposition hearing for the following month.

In an addendum report filed for that hearing, CFS reported that the children's caregivers were no longer willing to supervise visits with mother. The children yelled, screamed, and refused to leave with the caregivers when visits with mother ended. Zuri once slapped her caregiver in the face when the caregiver attempted to place Zuri in a car seat after a visit. According to the caregivers, mother did not do anything to calm the children down or to help the children transition at the end of visits.

In early November 2023, a social worker spoke with mother before a scheduled visit at CFS's office. The social worker asked mother to leave before the children at the end of the visit because of the difficulty the children were having after visits. Mother refused, stating, "'I do not leave my children.'" The social worker supervised the visit and reported that mother and the children seemed to enjoy the visit that day, but when the visit ended, the children "began to cry, scream, hit, push, and become physically aggressive." Zuri and Zechariah refused to leave with the caregiver. Zuri held onto mother's leg. Zoe screamed at the social worker, and Zechariah cried. Mother refused to leave. Zoe threatened to hurt a social worker and did not allow Zechariah and Zuri to go

15

to their caregiver. According to the social worker, "Zechariah cried that he was told that if they behave this way they will get to go home." The children's behavior lasted for over one hour.

After Zechariah and Zuri eventually left, Zoe ran into a nearby store and screamed. Zoe exited the store and kicked the county vehicle, causing a "large dent." When inside the vehicle, Zoe kicked a social worker in the back of the head from the back seat. According to Zoe's caregivers, she remained dysregulated for about 45 minutes after she returned to the caregivers' home. She cried, screamed, cursed, and pounded the floor.

Given "the severity of the children's behavior, and the safety risks surround[ing] the visits ending," CFS concluded that mother's future visits would be conducted virtually until the children's behavior stabilized.

Five days after that incident, Zoe was placed in a short-term residential therapeutic program, but CFS reported that the placement was soon jeopardized because of mother's behavior. Mother threatened to kill the staff at the facility. Mother had a virtual visit scheduled with Zoe that did not occur, apparently because of a miscommunication. Mother called the facility, was "'verbally hostile'" to staff, threatened to go to the facility and "'fuck up [their] shit,'" and threatened to "'hunt [the staff] down.'" The facility filed a police report. The facility's director informed a social worker that if mother "continue[d] to sabotage the placement by threatening staff, they would not be able to keep Zoe in the placement."

A social worker later spoke with mother about the incident. Mother became angry and yelled. Mother explained that she had been upset that she did not get to visit with Zoe that night. Mother denied that she threatened staff.

Zoe was suspended from school and returned in mid-November 2023. Upon Zoe's return, mother refused to allow a social worker to attend a meeting with the school's assistant principal. Zoe and mother attended the meeting. Zoe reportedly had a "'meltdown'" during the meeting and specifically asked for the social worker, but mother denied the request.

CFS also reported that both Zoe and mother had threatened a particular social worker numerous times in October and November 2023. Mother told the social worker that she would face "'a reckoning,'" and mother warned the social worker that mother was already "investigating" the social worker. Zoe told her caregiver that she was going to find the social worker's home and kill the social worker. On another occasion, Zoe told her caregiver that she was going to hide a knife in the caregiver's home and stab the social worker on her next visit. As a result of the threats, CFS reassigned the case to a different social worker.

By mid-October 2023 and before the hearing at which the jurisdictional allegations were sustained, mother had attended eight individual therapy sessions. Mother's individual therapist reported that mother denied that she had ever physically abused any of the children. By late September, mother had completed 12 sessions of a parenting course. Before she was referred to that program, mother attended two sessions

17

with a different program. The initial program asked CFS to refer mother to a different program, because during class mother acted agitated, disrupted the class, mocked the teacher, and expressed frustration with the curriculum and the instructor's teaching style.

In the November 2023 addendum report, CFS reported that it did not believe that mother had benefitted from any of the services that she had received, as shown by her recent negative conduct. CFS recommended that all three children be removed from mother's custody and that mother receive reunification services. At the contested dispositional hearing in November, mother's counsel objected to CFS's recommendation and asked the court to return the children to mother's custody with family maintenance services.

The court ordered the children removed from both parents and ordered reunification services for mother. The court agreed with CFS's recommendation because of the information in the most recent addendum report, which showed that "there continues to be a lack of benefit and continued aggression and anger by the mother." The court ordered a minimum of once weekly, two-hour supervised visits for mother with each child individually, which the court believed would "best stabilize behaviors."

DISCUSSION

I.     *Removal*

To order a child removed from their parents' physical custody under section 361(c)(1), the juvenile court must find by clear and convincing evidence that (1) there "would be a substantial danger to the physical health, safety, protection, or physical or

18

emotional well-being" of the child in the parents' home, and (2) "there are no reasonable means by which the [child's] physical health can be protected without" removal. We review those findings for substantial evidence (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*)), taking into account the level of confidence that the "clear and convincing evidence" standard demands (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 995).

Mother argues that the record does not contain sufficient evidence to support the order removing the children from her custody. The argument lacks merit.

A. *Jurisdictional findings other than severe physical abuse of a child under age five are not prima facie evidence for removal*

In response to mother's challenge to the sufficiency of the evidence, CFS contends that "'[t]he jurisdictional findings are prima facie evidence the child cannot safely remain in the home,'" citing *T.V.*, *supra*, 217 Cal.App.4th at page 135. As recent cases have explained, that contention is incorrect. (*E.E.*, *supra*, 49 Cal.App.5th at pp. 218-219; *M.V.*, *supra*, 78 Cal.App.5th at p. 958; *In re K.S.* (2016) 244 Cal.App.4th 327, 342 (*K.S.*).)

Section 361(c)(1) provides that jurisdictional findings constitute prima facie evidence for removal if jurisdiction was based on severe physical abuse of a child under age five. (§§ 361(c)(1) ["[t]he fact that a minor has been adjudicated a dependent child of the court pursuant to subdivision (e) of Section 300 shall constitute prima facie evidence that the minor cannot be safely left [in the home]"], 300(e) [providing for dependency jurisdiction in cases of "severe physical abuse" of a child "under five years of age"].) By singling out cases under section 300(e) for special treatment, the statute

19

implies that other cases should not be so treated. (*In re Bryce C.* (1995) 12 Cal.4th 226, 231 ["Generally, the expression of some things in a statute implies the exclusion of others not expressed"].) Thus, in cases like this one, in which jurisdiction was taken under other subdivisions of section 300 but not under section 300(e), the jurisdictional findings do not constitute prima facie evidence that the children cannot safely remain in the home. (*E.E.*, *supra*, 49 Cal.App.5th at pp. 218-219; *M.V.*, *supra*, 78 Cal.App.5th at p. 958; *K.S.*, *supra*, 244 Cal.App.4th at p. 342.)

The only authority cited in *T.V.* for the contrary proposition is section 361(c)(1) and *Cole C.*, *supra*, 174 Cal.App.4th at page 917, which itself cites only section 361(c)(1). But as just explained, section 361(c)(1) provides no support for the proposition that every jurisdictional finding under any subdivision of section 300 constitutes prima facie evidence that the children cannot safely remain in the home. Rather, section 361(c)(1) supports the opposite conclusion: It is not true that every jurisdictional finding under any subdivision of section 300 constitutes prima facie evidence that the children cannot safely remain in the home. Only a jurisdictional finding under section 300(e) constitutes such prima facie evidence.

Other published opinions that make the same mistake as *T.V.* and *Cole C.* likewise cite only section 361(c)(1) or other cases relying on it. (*R.V.*, *supra*, 208 Cal.App.4th at p. 849 [citing § 361(c)(1)]; *Hailey T.*, *supra*, 212 Cal.App.4th at p. 146 [same]; *A.E.*, *supra*, 228 Cal.App.4th at p. 825 [same]; *John M.*, *supra*, 212 Cal.App.4th at p. 1126 [citing *Cole C.*]; *J.S.*, *supra*, 228 Cal.App.4th at p. 1492 [citing *T.V.*]; *A.F.*, *supra*, 3

20

Cal.App.5th at p. 292 [citing *John M.*]; *D.B.*, *supra*, 26 Cal.App.5th at p. 332 [citing *T.V.*].)  At least one treatise makes the same error, citing the same cases.  (27A Cal.Jur.3d (Apr. 2024) Delinquent and Dependent Children, § 370 & fn. 14 [citing *J.S.* and *R.V.*].)

In addition to being unsupported (and actually refuted) by section 361(c)(1), the claim that jurisdictional findings always constitute prima facie evidence for removal is incongruous when considered in light of the statutory scheme governing jurisdiction and disposition.  First, the standard of proof for jurisdictional findings is only preponderance of the evidence (§ 355, subd. (a)), but the findings required to justify removal from parental custody at disposition must be made by clear and convincing evidence (§ 361, subd. (c)).  Second, at the jurisdiction hearing the court does not make any findings concerning the availability of reasonable means to protect the children without removal from parental custody, but such findings are ordinarily required in order to remove the children from parental custody at disposition.  (§ 361, subd. (c)(1), (3) & (4).)  Given that removal findings under section 361(c)(1) are subject to a higher standard of proof than jurisdictional findings and include an additional element, it would be odd for the Legislature to provide that every jurisdictional finding under any subdivision of section 300 always constitutes prima facie evidence to support removal.  Rather, the Legislature's decision to single out jurisdictional findings under section 300(e) appears to reflect a legislative determination that because of the extreme danger posed by severe physical abuse of a child under age five, such a finding is prima facie sufficient to show,

21

by clear and convincing evidence, a substantial danger to the child's safety and the unavailability of reasonable means to protect the child without removal. But the Legislature has not made the same assessment with jurisdictional findings under other subdivisions of section 300. In interpreting a statute, we consider the statutory language "in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment." (*In re N.R.* (2023) 15 Cal.5th 520, 538.)

Moreover, the erroneous claim that jurisdictional findings always constitute prima facie evidence that the children cannot safely remain in the home has important adverse consequences for appellate challenges to removal from parental custody. (*E.E.*, *supra*, 49 Cal.App.5th at p. 219.) The error "effectively 'deprives parents of appellate review of removal if there was a sufficient evidentiary basis for jurisdiction.'" (*Ibid.*)

The children in this case were not adjudicated dependents under section 300(e). The petition contains no allegations under that provision, and the record contains no evidence that any of the children (including the one who was under age five when the petition was filed) have suffered severe physical abuse. The jurisdictional findings accordingly do not constitute prima facie evidence that the children cannot safely remain in the home.

B.      *Substantial evidence supports the removal findings and order*

The record contains substantial evidence supporting the removal findings and order.[3] Mother denied and minimized the problems that led to governmental intervention. She denied that she ever hit any of the children. She placed all the blame on 11-year-old Zoe, who mother claimed was genetically predisposed to lie. A social worker opined that mother's relationship with Zoe fit the dynamic of scapegoating and that Zuri and Zechariah were at risk of becoming scapegoats in Zoe's absence, thus becoming the child that mother blamed for everything. Moreover, mother coached Zuri and Zechariah to lie about whether mother hit Zoe. In addition, although mother participated in services (parenting classes and individual therapy), there was no evidence that mother was benefitting from those services. On the contrary, despite participating in those services, mother repeatedly yelled at and threatened the investigating social workers. She even threatened to kill staff at the facility where Zoe was living and receiving treatment. On the whole, substantial evidence supports the conclusion that mother's behavior posed a substantial danger to the children's physical or emotional well-being if they were placed with her.

---

[3]      CFS argues that mother forfeited her challenge to Zoe's removal by throwing Zoe out of the house and telling the social worker to take her. The argument is meritless. Mother's argument against Zoe's removal is a challenge to the sufficiency of the evidence, and such challenges are not forfeited by failure to raise them in the trial court. (*R.V.*, *supra*, 208 Cal.App.4th at p. 848; *In re Javier G.* (2006) 137 Cal.App.4th 453, 464.) Moreover, a parent can consent to detention and still oppose removal at disposition. Mother consented to Zoe's detention before the dependency petition was filed, but at the dispositional hearing mother argued that Zoe should be returned to her care. Mother thus did not forfeit her challenge to Zoe's removal at disposition.

Mother contends that there was insufficient evidence of a substantial danger to the children because (1) the Riverside County juvenile court initially did not detain Zuri or Zechariah, (2) the CFS social worker who interviewed Zuri and Zechariah in July 2023 believed that they could safely remain in mother's home, (3) mother cooperated with the initial DPSS social worker investigating the referral by inviting the social worker to her home, (4) Zoe's post-detention behavior supported mother's description of the problems in the home, and (5) the children's behavior after visits with mother demonstrated that they were bonded with mother and wanted to return home.  The arguments fail because the existence of contrary evidence does not mean that the trial court's findings are not supported by substantial evidence.  (*In re Alexandria P.* (2016) 1 Cal.App.5th 331, 338, fn. 4.)  Mother fails to address the ample evidence and reasonable inferences supporting the removal order.  We are required to draw all reasonable inferences in support of the juvenile court's order.  (*R.T.*, *supra*, 3 Cal.5th at p. 633.)

Substantial evidence also supports the finding that there were no reasonable means to protect the children short of removal.  Mother suggests that a reasonable alternative to removal would have been placing the children in her care while she participated in services under CFS's supervision.  But the record contains substantial evidence that such measures would have been inadequate to protect the children.  There was extensive evidence that mother consistently failed to cooperate with CFS (and DPSS) throughout the proceedings, culminating in mother's explicit and repeated threats to harm a social worker and staff at a residential treatment program where Zoe was placed.  Moreover,

24

mother was in therapy when she was abusing Zoe and Zuri and participating in services when she threatened the social worker and staff at the treatment facility. Given mother's lack of cooperation with CFS and DPSS, her history of coaching the children to conceal her inappropriate physical discipline of Zoe, and her failure to make substantive progress in the services in which she was already engaged, it was reasonable for the court to infer that there were no reasonable means to protect the children short of removal.

For all of these reasons, we conclude that substantial evidence supports the court's removal findings and order.

## II. *Visitation*

Mother contends that the juvenile court abused its discretion by limiting the frequency and duration of visits and by requiring visits to be supervised. The contentions lack merit.

Section 362.1 provides: "In order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . , any order placing a child in foster care, and ordering reunification services, shall provide . . . [¶] . . . for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) "No visitation order shall jeopardize the safety of the child." (*Id.*, subd. (a)(1)(B).) "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.* (2020) 44

25

Cal.App.5th 1058, 1070.) "'""""The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"""" (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1123.)

The juvenile court acted well within its discretion by requiring supervision during mother's visits. According to the sustained allegations of the petition (which mother does not challenge), she engaged in inappropriate physical discipline of Zoe, including hitting her with hangers and shoes. In addition, the record contains evidence that mother coached the children to lie in order to conceal that conduct. And when the children were acting out at the end of a visit, Zechariah said that they were told that if they behaved that way they would get to go home; it is reasonable to infer that mother is the one who told them that. Given all of that evidence, it was reasonable for the court to require that mother's visits be monitored to make sure that she did not continue to engage in inappropriate physical discipline, coach the children to conceal their mistreatment, or encourage them to misbehave.

As for the frequency and duration of visits, the visitation order entered at disposition (like all of the court's previous visitation orders) specified a *minimum* frequency and duration for mother's visits. Consequently, mother's argument that the order was erroneous because it "did not allow mother visitation as frequent as possible" is not supported by the record. Mother cites no evidence that she attempted to arrange but was prevented from having more visits or longer visits than the minimum ordered.

For the foregoing reasons, we conclude that the juvenile court's visitation order did not constitute an abuse of discretion.

DISPOSITION

The dispositional findings and orders are affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.

27